Opinion issued May 3, 2012.



In The

Court of Appeals

For The

First District of Texas

————————————

NO. 01-10-01148-CV

NO.
01-10-01149-CV

———————————

L.F.,
Appellant

V.

Department
of Family & Protective Services, Appellee



 



 

On Appeal from the 311th
Judicial District Court

Harris County, Texas



Trial
Court Case Nos. 2008-53865, 2009-28149

 



 

 

MEMORANDUM OPINION

          In
this accelerated appeal,[1] appellant, L.F., challenges
the trial court’s order, entered after a bench trial, terminating her parental
rights to her two minor children.  In
seven of her sixteen issues, appellant contends that the evidence is legally
and factually insufficient to support the trial court’s findings that she
knowingly placed or knowingly allowed the children to remain in conditions or
surroundings which endangered the physical or emotional well-being of the
children,[2] she engaged in conduct or
knowingly placed the children with persons who engaged in conduct which
endangered the physical or emotional well-being of the children,[3] she failed to comply with
the provisions of a court order that specifically established the actions
necessary for her to obtain the return of her children who had been in the
temporary managing conservatorship of appellee, the Department of Family &
Protective Services (“DFPS”),[4] and termination of her
parental rights was in the best interest of the children.[5]  In eight of her sixteen issues, appellant
contends that she received ineffective assistance of counsel.  In her eighth issue, appellant contends that
there was “[n]o causal nexus between conditions in [her] household and imminent
danger to health, safety or welfare of children” to justify “emergency removal”
of children from the home.[6]

          We affirm.

Background

          On May 5, 2009, DFPS issued a “notice of removal of
children,” wherein, Yesenia Perez, the DFPS caseworker assigned to appellant
and her children, noted that appellant suffered from “mental health
instability” and Perez was “[u]nable to locate relatives or friends for
voluntary placement.”  The trial court,
on May 6, 2009, entered an “order for protection of a child in an emergency and
notice of hearing” regarding appellant’s children.  The court recognized that DFPS had removed
the children from appellant’s custody,[7] and it named DFPS the
temporary sole managing conservator for both children pending a full adversary
hearing.[8]  DFPS then filed a petition to terminate
appellant’s parental rights to both of her children.  

DFPS
attached to its petition the affidavit of Perez, in which she summarized events
that took place before DFPS took emergency custody of the children.  In her affidavit, Perez testified that on
March 6, 2009, DFPS received a report describing appellant’s behavior as manic
and alleging that appellant had been neglectful in supervising her
children.  Appellant, who was a teacher,
and her daughter had been absent from school on February 19 and February
20.  Medical records indicated that, on
February 21, 2009, a police officer took appellant to the Harris County
Psychiatric Center, where she was placed in a four-point restraint due to
“combative,” “destructive,” and “self-destructive” behavior and “poor impulse
control.”  Test results indicated that
appellant had amphetamines in her system. 
Although appellant was released on February 23, 2009 after being
diagnosed with substance-induced “psychotic disorder,” she was again
hospitalized on March 2, 2009.  Her
behavior was characterized as “disoriented” and “more bizarre” than before, and
her daughter was again absent from school on that date.  

On April
13, 2009, DFPS received a referral alleging that appellant had physically
abused both of her children.  Appellant’s
mother had called for emergency assistance, stating that appellant had been
“hitting and yelling at the children.” 
Appellant “seemed delusional,” and a police officer who had been
dispatched to appellant’s house remarked that officers had been called to the
home “a couple of times because of disagreements between the grandmother and
mother.”  Lenique Horace, a DFPS
caseworker, interviewed appellant’s daughter, who stated that appellant had
spanked her and appellant’s son had a “nickel-sized mark on his head” because he
“was trying to pull himself up on the refrigerator and fell over.”  Horace also interviewed appellant, who stated
that she merely had a “little argument” with her mother and she was “going to
counseling.”

Perez
further testified that on April 22, 2009, DFPS received another referral
alleging appellant’s neglectful supervision of the children.  When Perez arrived at appellant’s house, she
discovered that appellant was not there, and she called appellant on her
cellular telephone.  Appellant informed
Perez that she had been at a bank and was on her way home.  When appellant arrived at the home, she told
Perez that her mother had left to pick up the children and they “probably went
out to eat dinner.”  When Perez inquired
about appellant’s “mental health,” appellant replied that her doctor had
prescribed her medicine “for a psychiatric disorder” but the medicine “caused
her to be ill.”  A police officer then
arrived at appellant’s house and explained that a bank employee “had called the
police on [appellant] because of her behavior” as “she was apparently yelling
in or near the bank.”  

Perez noted
that appellant “appeared to make up elaborate stories,” and Perez became
“uneasy” due to appellant’s “abrupt mood changes.”  Perez explained that “DFPS wanted [appellant]
to participate in Family Based Safety Services,” which “would possibly involve
a psychological assessment and other services.” 
Eventually, appellant “agreed to move out of the home and allow the
children to stay with” her mother, but appellant continued to yell at
Perez.  When appellant’s mother arrived,
she “agreed and believed her daughter needed help.”  However, over the next few days, appellant’s
mother called Perez several times to inform her that appellant “had been trying
to get into the home.”  At one point,
appellant called Perez from a neighbor’s home, stating “that she thought she
should be able to go to her home,” but Perez replied that DFPS “needed her to
get some treatment.”

On May 4,
2009, Perez learned that appellant’s mother had been admitted to a hospital
because she was “disoriented and not feeling well.”  Perez determined that appellant’s mother “was
not going to be able to handle fending off [appellant] in [her] current
state.”  Because appellant’s mother was
hospitalized and appellant “had not received treatment for her mental health,”
DFPS took the children from the hospital and placed them in a foster home.  Perez spoke to appellant, who “stated that
she [did] not have anywhere for the children to go because they should be with
her,” and appellant did not “provide the agency with any information on
possible voluntary placements.”  As a
result, DFPS asked to be named Emergency Temporary Managing Conservator of both
children, and Perez opined that there was “reasonable cause to believe that the
children [would be] in imminent danger of physical abuse” if they remained with
appellant.

On June 17,
2009, DFPS issued a Family Service Plan (“FSP”) for appellant, requiring her to
attend a parenting class, undergo a psychological evaluation “and follow all
recommendations,” visit the children twice a month, and “comply with all CPS
approved services and follow all recommendations from the service
providers.”  The trial court then
conducted a full adversary hearing as a bench trial.  

At trial,
appellant testified that she gave birth to her daughter in January 2001 and her
son in June 2008.  Appellant admitted
that in 2001, the Tennessee Department of Children’s Services (“TDCS”) took
legal custody of her daughter for six months because she “allowed another
person to hold [her] daughter and it was inappropriate.”  After DFPS obtained the emergency order
naming it the temporary possessory conservator for both children in May 2009,
appellant moved to Tennessee in August to live with friends, and she did not
visit the children until February 2010, when she moved back to Texas.  While in Tennessee, appellant attended
parenting classes and received “treatment services” because of her “Bipolar
disorder,” which had first been diagnosed in 2001.  She also voluntarily admitted herself to the
Middle Tennessee Mental Health Institute (“MTMHI”) because of “side effects”
from a “drug called Cymbalta.”  After her
discharge, and on the recommendation of the doctors at MTMHI, appellant went to
the Centerstone Psychiatric Facility, where she took her parenting classes.  In the report from Centerstone, appellant denied
ever seeing a doctor, undergoing a psychiatric evaluation, or being diagnosed
with “schizophrenia, paranoid type.” 
When she returned to Houston, appellant began seeing Dr. Plummer, a
psychiatrist, about once every two weeks, and he prescribed her “900 milligrams
of Lithium.”

Appellant
explained that in April 2009, she told a DFPS caseworker that she had been
prescribed a medicine that caused her “some ill effects,” but she denied that a
police officer had ever come to her home or she had ever told a caseworker any
“elaborate stories.”  Appellant admitted
that there had been an “incident” at her bank over her “mother’s bills,” but
she denied “yelling” at anyone at the bank. 
Ultimately, appellant agreed to leave the house so that she could “keep
[the children] in the home.”  She
explained that, at the time of trial, she was employed at Rainbow Works, a
“care facility,” and living in her own apartment.  Appellant believed that she had completed,
“four or five months” before the trial, the requirement in her FSP to complete
a “psychological evaluation,” although she could not recall where she underwent
the evaluation.

Patti
Block, the court-appointed guardian ad litem for the children, testified that
she conducted an independent review of DFPS’s investigation.  Block opined that appellant demonstrated a
“lack of nurturing,” was not “in touch” with her children’s “day-to-day lives,”
and was not able to “take care” or “provide for them.”  Block felt that appellant’s interactions with
her daughter were “inappropriate,” and she explained that the daughter would
have “nightmares” and “sleep-walking issues” after meeting with appellant.  Block was also concerned about appellant’s
“inconsistency,” “highs and lows,” and mental “instability.”  And she opined that appellant had “difficulty
maintaining her touch with reality.” 
Block explained that she had not heard of Dr. Plummer before the trial
and never received any reports from Dr. Plummer.  Block was also not aware that appellant had
obtained a new job or apartment.

Block
received a May 2010 psychological evaluation of appellant by Dr. Mandi Norris
at West University Psychological Associates. 
Dr. Norris diagnosed appellant as having “delusional disorder,” but she
ruled out “schizophrenia/schizoaffective disorder.”  Among the recommendations in Dr. Norris’s
evaluation were that appellant be referred for a
“psychiatric evaluation” and undergo “individual therapy.”  However, Block received only one telephone
call from appellant in which she stated that she “was going to a therapist,”
and Block did not receive any records regarding such therapy.  On cross-examination, Block explained that
she met with DFPS caseworkers in the summer of 2010, and they informed her that
appellant had been receiving “treatment.” 
However, Block did not recall where appellant had received treatment,
and she was not contacted by a psychiatrist or psychologist about any such
treatment.

Chequetta
Deadmon, a DFPS caseworker, testified that she was assigned to appellant’s case
since May 2009 and sent the FSP to appellant while she was residing in
Tennessee.  Appellant signed the FSP and
sent it back to DFPS.  Because Deadmon
had received no evidence that appellant had attended “individual therapy” or undergone
a “psychiatric evaluation” as recommended by Dr. Norris, Deadmon did not
believe appellant had complied with the terms of the FSP.

Deadmon
explained that when appellant made her first visit to the children in June
2009, she was “very dirty” and “had a lot of baggage with her.”  Once placed in the room with her children,
appellant “started mumbling chants” and “telling [her daughter] that she
belonged to God and when she turns 18 that God will take her away.”  Appellant also “whisper[ed] a chant” into her
son’s ear.  Concerned that appellant was
not “in her right state of mind,” Deadmon called a security guard to escort her
out of the office.  One week later,
appellant returned to the DFPS lobby, “throwing out random statements” and
“demanding to see her children,” despite the fact that the children were not in
the building at that time.  Deadmon next
heard from appellant in September 2009, when appellant informed Deadmon that
she had moved to Tennessee.  Deadmon
opined that appellant had “no bond with” her son, and she explained that,
during visits, her “whole focus is mostly” on her daughter.

Deadmon
further testified that although she received requested records from
Centerstone, she never received any information or documentation regarding
appellant’s employment at Rainbow Works or the apartment where she testified
that she had been living.  Also, when she
asked appellant what medication she was taking, appellant could not
remember.  On cross-examination, Deadmon
admitted that DFPS did not provide appellant with a copy of Dr. Norris’s
psychological evaluation.  However, she
explained that although DFPS had referred appellant to undergo a psychiatric
evaluation, appellant did not appear for the evaluation.  Deadmon also explained that although she
asked appellant to provide her with a release pertaining to her visits with Dr.
Plummer, appellant would not agree to a release.  Deadmon opined that appellant was “paranoid
schizophrenic” and had failed “to get treatment for her medical condition.”

During
Deadmon’s testimony, DFPS entered into evidence the discharge summary from
appellant’s stay at MTMHI and her psychiatric evaluation from Centerstone.  The MTMHI discharge summary indicated that
appellant had been admitted “for psychotic behavior” and had “suicidal ideation
with unknown plans.”  Under “Mental
Status Examination,” the summary described appellant as “disheveled” and
“disoriented” and her behavior as “uncooperative, hostile, and bizarre.”  Appellant was “delusional, with [a] disorganized
thought process.”  She claimed she wanted
to “die for Jesus,” and, after two days, “continued to have delusional thoughts
that she was dating Kenny Chesney.” 
Appellant was then discharged to Centerstone, where she was diagnosed
with “schizophrenia, paranoid type.” 
During her last visit to Centerstone, she was prescribed Risperidone and
Venlafaxine.

Perez
testified about the incident in which a police officer, during one of Perez’s
visits to appellant’s home, came to the door and explained that appellant’s
bank “had called the police on her because she was . . . being loud or
yelling.”  After speaking with appellant
for “a little bit,” the police officer left the home.  Perez explained that appellant “didn’t seem
to be stable” and told “elaborate stories about celebrities.”  When Perez mentioned her concern about appellant’s
mental health to appellant, she got “angry and . . . start[ed]
to [raise] her voice,” but then “change[d] her mood immediately” and acted
“nice.”  Perez then recommended that
appellant leave the house to get treatment. 
Although appellant initially refused, “after awhile she did agree to . .
. move out of the home” because she could not provide information regarding
another relative or friend’s house that would be appropriate for the children
to reside in.  Afterwards, Perez received
several calls from appellant’s mother informing her that appellant had been
trying to break into the house “through the window” or “through the
garage.”  When Perez learned that
appellant’s mother had been hospitalized, Perez decided that she had to remove
the children and requested an emergency order naming DFPS temporary managing
conservators of the children.  On
cross-examination, Perez admitted that the children were not in the home at the
time of the incident concerning the bank and her home did not appear “unlivable.”   

Dr. Glen
McLure, a licensed psychologist, testified that he had evaluated appellant
shortly before trial.  He explained that
appellant was referred to him by Dr. Plummer, a psychiatrist.  McClure opined that appellant “indicated some
depression,” but it “wasn’t severe.”  He
did not believe that appellant suffered from paranoid schizophrenia or “any
psychotic disorders,” but he did diagnose her as having “Bipolar disorder,
which at one time had some psychotic features to it.”  McClure explained that “a majority of people
are able to function” with Bipolar treatment, provided they “stay in complian[ce] with their medication” and are “monitored by a
mental health professional.”   McClure
did “not see any reason” why appellant could not return to teaching, “work with
children,” or parent effectively.  

On
cross-examination, McClure explained that a “typical issue with Bipolar people”
is that they sometimes “misperceive that they don’t need” medication.  He admitted that if her symptoms deteriorated
so that she “was allowed to be admitted to a hospital for a mental health
problem,” then appellant “probably wasn’t functioning very well as a
parent.”  However, McClure opined that
with adequate “monitoring” and continued medication, appellant could be a functional
parent.  Although he conceded that appellant
had “some psychotic incidents,” he did not believe that they “met the criteria
for” paranoid schizophrenia.  Ultimately,
McClure noted that appellant “acknowledges that Bipolar is a legitimate
diagnosis for her,” but he also conceded that appellant had a history of
discontinuing her medication.  He also
explained that “there’s some evidence that giving a Bipolar
person antidepressants . . . accelerates or causes them to go into a manic
phase.”

Appellant
testified that she had medical issues when she was prescribed Cymbalta, an
antidepressant, following the birth of her son, but she was, at the time of
trial, taking Lithium instead.  She noted
that she had completed parenting classes and had been regularly attending
therapy sessions with Dr. Plummer.  She
explained that she had moved to Tennessee to live with friends because she was
“hoping to bring the children there” but “immediately came back to Texas” when
she learned that was not an option.

Sufficiency of the Evidence

          In her
fourth and sixth issues, appellant argues that the evidence is legally and
factually insufficient to support the trial court’s finding that she endangered
her children because “[c]lear and convincing evidence was not admitted at trial
that [she] committed specific acts or omissions” constituting
“endangerment.”  See Tex. Fam. Code Ann.
§ 161.001(1)(E)
(Vernon Supp. 2011).  In her sixteenth
issue, appellant argues that the evidence is insufficient to “prove
[appellant’s] failure to complete actions required by the Family Service
Plan.”  In her fifth issue, appellant
argues that the evidence is legally and factually insufficient to prove that
termination of her parental rights was in the best interest of the
children.  See Tex. Fam.
Code Ann. § 161.001(2).  

          A
parent’s right to “the companionship, care, custody, and management” of her
children is a constitutional interest “far more precious than any property
right.”  Santosky
v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388,
1397 (1982) (internal citation omitted).  The United States Supreme Court has emphasized
that “the interest of parents in the care, custody, and control of their
children is perhaps the oldest of the fundamental liberty interests recognized
by this Court.”  Troxel
v. Granville,
530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000).  Likewise, the Texas Supreme Court has also
concluded that “[t]his natural parental right” is “essential,” “a basic civil
right of man,” and “far more precious than property rights.”  Holick v. Smith, 685 S.W.2d
18, 20 (Tex. 1985).  Consequently,
termination proceedings should be
strictly scrutinized.  Id.

          Because termination “is complete, final,
irrevocable, and divests for all time that natural right . . . , the evidence
in support of termination must be
clear and convincing before a court may involuntarily terminate a parent’s
rights.”  Id. (citing Santosky, 455 U.S. at
747–48, 102 S. Ct. at 1391–92; Richardson v. Green, 677 S.W.2d
497, 500 (Tex. 1984)).  Clear and
convincing evidence is “the measure or degree of proof that will produce in the
mind of the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established.”  Tex. Fam. Code Ann. § 101.007 (Vernon
2008); In re J.F.C., 96 S.W.3d 256, 264 (Tex. 2002).
 Because the standard of proof is “clear
and convincing,” the Texas Supreme Court has held that the traditional legal
and factual standards of review are inadequate.  In
re J.F.C., 96 S.W.3d at 264–66.

In conducting a legal-sufficiency review in a
parental-rights termination case,
we must determine whether the evidence, viewed in the light most favorable to
the finding, is such that the fact finder could reasonably have formed a firm
belief or conviction about the truth of the matter on which DFPS bore the
burden of proof.  See id. at 266.  In viewing
the evidence in the light most favorable to the finding, we “must assume that
the fact finder resolved disputed facts in favor of its finding if a reasonable
fact finder could do so,” and we “should disregard all evidence that a reasonable
fact finder could have disbelieved or found to be incredible.”  In re J.P.B., 180 S.W.3d
570, 573 (Tex. 2005).

In conducting a factual-sufficiency review in a
parental-rights termination case, we must determine whether, considering the
entire record, including both evidence supporting and evidence contradicting
the finding, a fact finder reasonably could have formed a firm conviction or
belief about the truth of the matter on which the State bore the burden of
proof.  Id.; In re C.H., 89 S.W.3d
17, 25 (Tex. 2002).  We should
consider whether the disputed evidence is such that a reasonable fact finder
could not have resolved the disputed evidence in favor of its finding.  In
re J.F.C., 96 S.W.3d at 266–67.
 “If, in light of the entire record, the
disputed evidence that a reasonable fact finder could not have credited in
favor of the finding is so significant that a fact finder could not reasonably
have formed a firm belief or conviction, then the evidence is factually
insufficient.”  In
re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).

In proceedings to terminate the parent-child relationship
brought under section 161.001, DFPS must establish,
by clear and convincing evidence, one or more of the acts or omissions
enumerated under subsection (1) of section 161.001 and that termination is in the best interest of
the child.  Tex. Fam. Code Ann. § 161.001.
 Both elements must be established, and termination may not be based solely on
the best interest of the child as determined by the trier of fact.  Tex. Dep’t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).
“Only one predicate finding under section 161.001(1) is necessary to support a
judgment of termination when there is also
a finding that termination is in
the child's best interest.”  In re A.V., 113 S.W.3d 355, 362 (Tex. 2003).

Endangerment

          A court may terminate the parent-child
relationship if the court finds by clear and convincing evidence that the
parent has engaged in conduct or knowingly placed the child with persons who
engaged in conduct that endangers the physical or emotional well-being of the
child.  Tex. Fam. Code Ann. § 161.001(1)(E).  “Endanger”
means to expose to loss or injury or to jeopardize.  Boyd, 727 S.W.2d at 533.
Although such endangerment
requires more than a threat of metaphysical injury or the possible ill effects
of a less-than-ideal family environment, it is not necessary that the conduct
be directed at the child or that the child actually suffer injury.  In re J.T.G., 121 S.W.3d
117, 125 (Tex. App.—Fort Worth 2003, no pet.). The specific danger to
the child’s well-being may be inferred from parental misconduct standing alone.
 Boyd, 727 S.W.2d at 533; In re R.W., 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  

          Here, there is evidence that appellant
engaged in a course of unstable behavior. 
Records from TDCS indicate that, beginning in 2001 after the birth of
appellant’s daughter, TDCS had been concerned with appellant’s ability to raise
her because appellant was “bi-polar and ha[d] not been taking her medication as
prescribed.”  These records also indicate
that appellant was hospitalized, and other medical records described her as
“severely mentally unstable” with suicidal thoughts.  Also in 2001, TDCS received a telephone call
from the manager of a Dillard’s department store, explaining that appellant had
entered the store with her daughter and “did not seem to know where she was,”
“appeared to be confused,” “would ramble about different subjects,” and would
give her daughter to strangers and then leave the vicinity.

          More recently, DFPS, in 2009, received
two reports of appellant’s neglectful supervision of her children.  Her daughter was absent from school on
February 19 and February 20, 2009.  And
medical records indicate that, on February 21, 2009, police officers took
appellant to the Harris County Psychiatric Center because she was “out of
control at home” and “acting bizarre.” 
When taken to the Psychiatric Center, appellant had to be placed in a
four-point restraint for being “combative,” “self-destructive,” and
aggressive.  The report, which was
introduced into evidence, notes that appellant was screaming “obscenities,”
“racial epithets,” and “hypersexual remarks” at the staff, and she had “very
poor insight into the events   . . . that
prompted calling of the police.” 
Appellant tested positive for amphetamines in her system, and she was
ultimately discharged with a diagnosis of “substance-induced psychosis,” which
the attending physician opined was caused by her ingestion of diet pills.  

One month later, after another allegation of neglectful
supervision and an allegation of “physical abuse” from appellant’s mother, DFPS
caseworker Perez visited appellant’s home, where a police officer arrived and
explained that a bank had reported that appellant had been “yelling” at the
bank.  Perez noted that appellant told
“elaborate stories about celebrities.”  Although
appellant had agreed to leave the children with her mother and receive
treatment for her mental illness, appellant’s mother called DFPS several times
afterwards, alleging that appellant was trying to break into the house.  

Shortly thereafter, DFPS took custody of the children, and
appellant admitted that she was homeless for “two or three months.”  During one visit with the children in June
2009, DFPS caseworker Deadmon explained that appellant was “very dirty” and
carried “a lot of baggage with her.” 
Deadmon testified that when appellant entered into the room to see her
children, she was “mumbling chants” and “telling [her daughter] that she
belonged to God and when she turns 18 that God will take her away.”  She eventually had to be escorted from the
DFPS office. 

          In August 2009, after appellant had
moved to Tennessee, she was admitted to MTMHI because of her “psychotic
behavior.”  In the mental status
examination, it was noted that appellant was “disheveled” with “poor hygiene”
and “disoriented.”  Her behavior was
described as “uncooperative, hostile, and bizarre,” and it was noted that she
possessed a “[p]oor insight into her current illness and situation.”  The examination also revealed that appellant
had “thought content with suicidal ideation” and “religious delusions,” and she
claimed “she wanted to ‘die for Jesus.’” 
On her second day at MTMHI, appellant “became very angry” and
“[c]ontinued to have delusional thoughts.” 
She was eventually discharged to Centerstone, where she was diagnosed
with “schizophrenia, paranoid type.” 

          In addition to appellant’s history of
unstable and delusional behavior, medical evaluations of her repeatedly express
a concern that she does not understand the severity of her mental health
problems.  For example, in the MTMHI
evaluation, it was noted that appellant had “[p]oor insight into her current
illness and situation” and concern was expressed about possible “noncompliance
with treatment.”  In her Centerstone
evaluation, it was noted that appellant denied “any manic [symptoms] or ever
being psychotic, which [was] contradictory” to the report from MTMHI.  In the psychological evaluation from West
University Psychological Associates, it was reported that “[appellant’s]
presentation during the course of [her] evaluation suggests that she has no
meaningful insight into her history of psychological difficulties.”  And Dr. McClure noted that appellant’s
“episodic memory was below average,” she could not “provide a reasonably
accurate history of her mental health treatment,” and she lacked “complete
awareness of the severity of her mental health problems.”  Finally, Deadmon testified that although DFPS
had twice referred appellant for a psychiatric evaluation, she did not attend
either appointment.

          In her reply brief, appellant
“disputes that evidence” of incidents occurring “after the removal” of her
children from her custody “can be used” to prove endangerment under sections
161.001(1)(D) or 161.001(1)(E).  In support of this proposition, she cites In re J.K.F., 345 S.W.3d 706 (Tex.
App.—Dallas 2011, no pet.).  In J.K.F., the court noted that “[t]he
relevant time frame within which to determine whether there is clear and
convincing evidence of endangerment to the child is before the child was
removed.”  Id. at 711.  Here, however, as noted above, appellant’s
long history of mental illness included her inability to recognize the severity
of her illness and properly medicate herself. 
Thus, the medical evidence and evidence of incidents occurring after the
children had been removed from appellant’s custody is relevant as establishing
appellant’s mental health problems and that she actually endangered her
children before this removal.

          Viewing the evidence in the light most
favorable to the trial court’s findings, we conclude that the trial court could
have formed a “firm belief or conviction” that appellant’s history of
delusional behavior, together with multiple reports indicating that she lacked
insight into the severity of her mental health condition, and her failure to
properly seek treatment and take medication constituted a course of conduct
that endangered the physical and emotional well-being of her children.  See
Tex. Fam. Code
Ann. § 161.001(1)(E); see also In re J.I.T.P., 99 S.W.3d 841,
845–46 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (“[T]he trial court could
have considered the mother’s desire to hurt herself and her history of
noncompliance with her medication schedule as factors endangering [her child’s]
well-being.”); In re R.M., No.
14-02-00221-CV, 2003 WL 253291, at *3–4 (Tex. App.—Houston [14th Dist.] Feb. 6, 2003, no pet.) (mem. op.) (noting parent’s “major depressive disorder which led to
suicidal tendencies” and “failure to maintain a consistent therapy schedule” as
significant factors indicating endangerment); In re C.D., 664 S.W.2d 851, 853–54 (Tex. App.—Fort Worth 1984, no
pet.) (holding evidence sufficient to support finding of endangerment where
mother was hospitalized over twenty times for paranoid schizophrenia, there was
“testimony that the mother had been violent in the past because of her mental
condition,” and she had made several suicide threats) (citing
Carter v. Dallas County Child Welfare
Unit, 532 S.W.2d 140 (Tex. Civ. App.—Dallas 1976, no writ)).  Considering the entire record, although
appellant testified that she was receiving treatment at the time of trial, and
Dr. McClure testified that he believed that appellant could parent effectively
with consistent medication and therapy, we conclude that a reasonable
fact-finder could have found that appellant’s history of mental illness and
failure to recognize its severity demonstrated that consistent improvement was
unlikely.  See In re A.M.C., 2 S.W.3d 707, 716–17
(Tex. App.—Waco 1999, no pet.) (holding that although
several doctors testified that mother with mental illness “had made significant
progress,” jury could have resolved inconsistencies in favor of
termination).  Accordingly, we hold that
the evidence is legally and factually sufficient to support the trial court’s
finding that appellant engaged in conduct that endangered the physical or
emotional well-being of her children.  See Tex. Fam. Code Ann. § 161.001(1)(E).

          We overrule appellant’s fourth and
sixth issues.  

Having held
that the evidence is legally and factually sufficient to support the trial
court’s finding under section 161.001(1)(E), we need not address appellant’s
argument that the evidence is legally and factually insufficient to support the
trial court’s findings under section 161.001(1)(D) or her sixteenth issue, in
which she argues that the evidence is legally and factually insufficient to
“prove [appellant’s] failure to complete the actions required by the Family
Service Plan” under section 161.001(O).  See In re A.V., 113 S.W.3d 355, 362
(Tex. 2003) (“Only one predicate finding under section 161.001(1) is necessary
to support a judgment of termination when there is also a finding that
termination is in the child’s best interest.”).

Best
Interest

          In determining whether the termination of appellant’s parental
rights was in the children’s best interest, we may consider several factors,
including (1) the children’s desires, (2) the current and future physical and
emotional needs of the children, (3) the current and future physical danger to
the children, (4) the parental abilities of appellant, (5) whether programs are
available to assist appellant in promoting the best interests of the children,
(6) plans for the children by appellant, (7) the stability of the home, (8)
acts or omissions of appellant that may indicate that the parent-child
relationship is not proper, and (9) any excuse for acts or omissions of appellant.
Holley v. Adams,
544 S.W.2d 367, 371–72 (Tex. 1976); In re L.M., 104 S.W.3d 642, 647 (Tex. App.—Houston
[1st Dist.] 2003, no pet.).  The Holley
factors are not exhaustive, and there is no requirement that DFPS prove all
factors as a condition precedent to parental termination.
 See In re C.H., 89 S.W.3d at 27.

          In regard to the parenting abilities
of appellant, as noted above, appellant has been hospitalized for mental health
issues on several occasions, beginning as early as 2001 after the birth of her
daughter.  Her daughter had previously
been taken into custody by TDCS, and DFPS had received six referrals since the
birth of her son.  In regard to any acts or
omissions that may indicate the existing parent-child relationship is not
proper, Bock, the children’s guardian ad litem, testified that appellant
demonstrated a “lack of nurturing” and was not “in touch with [the children’s]
day-to-day lives.”  She also testified
that appellant would make inappropriate comments during visitations and, with
respect to her daughter, “[i]t’s as if the roles were reversed and [her
daughter] was taking on the mother’s role.” 
Bock, in her report to the court, stated that appellant’s son “is not
bonded to his mother.”  Deadmon also
testified that appellant has “no bond” with her son and during visits her
“whole focus” is on her daughter.   In
contrast, Bock testified that the foster family was a “loving family,” the
father was a pastor and often worked from home to look after the children, and
both children had bonded with their foster parents and their two older
biological children.  

In regard to programs available to assist in the care of
appellant, there is some evidence that appellant had been attending therapy
sessions with Dr. Plummer in the four months before trial.  However, there is also evidence that
appellant had twice failed to show up for psychiatric evaluations set up by DFPS,
and several notations from the medical records introduced into evidence
indicate appellant’s failure to acknowledge the severity of her mental
illness.  In regard to the stability of
her home, appellant testified that, at the time of trial, she was working at a
retirement home and had her own apartment. 
However, DFPS never received any documents pertaining to appellant’s
state of employment or her residence. 
Instead, appellant testified that in the summer of 2009, she was
homeless for two or three months.  She
then moved into a friend’s house in Tennessee.   Bock, in her court report, stated that upon
appellant’s return to Texas, she lived with two “friends” but had “no
established relationship with them . . . until moving into their home.”  

          Viewing the evidence in the light most
favorable to the trial court’s findings, we conclude that the trial court could
have formed a “firm belief or conviction” that termination of appellant’s
parental rights was in the children’s best interests.  Considering the entire record, appellant did
provide evidence that she was attending therapy sessions, taking medication,
and working at Rainbow Works at the time of trial.  However, DFPS presented evidence that
appellant had a long history of mental illness, failed to show up for scheduled
psychiatric evaluations, and acted inappropriately at several visits, and her
daughter missed school twice due to appellant’s mental illness.  Accordingly, we hold that the evidence is
legally and factually sufficient to support the trial court’s finding that
termination of appellant’s parental rights was in the children’s best interest.


          We overrule appellant’s fifth issue.

Ineffective Assistance
of Counsel[9]

          In her first, second, third, tenth,
eleventh, thirteenth, fourteenth, and fifteenth issues, appellant argues that
she received ineffective assistance of trial counsel because she was
“prevented” from “carrying through with her request for a jury trial” and
“submitting and offering testimony and other evidence which would have defeated
the [DFPS’s] claims”;  her trial counsel
“failed to object to unduly prejudicial information . . . and to appropriately
respond to [DFPS’s] objections to her evidence”;  she was prevented from “presenting evidence
of compliance with psychiatric or psychological evaluation and other service plan
requirements” and “presenting evidence that the statutory basis for removal of
children from home not met”; and she was prevented from presenting evidence that
“she sought and received appropriate and effective treatment for her mental and
physical illness sufficient to remove danger to the health, safety, and welfare
of children,” “making the Department the sole conservator was not in the children’s
best interest,” and “the acts or omissions alleged were solely the acts or
omissions of others.”

          Proving ineffective assistance of
counsel requires a showing that (1) counsel made errors so serious that counsel
was not functioning as “counsel” guaranteed by the Sixth Amendment and (2) the
deficient performance of counsel prejudiced the defense in a manner “so serious
as to deprive the defendant of a fair trial, a trial whose result is reliable.”
 In re H.R.M., 209 S.W.3d
at 111 (citing Strickland
v. Washington,
466 U.S. 668, 687, 104 S. Ct. 2052 (1984); In re M.S., 115 S.W.3d
534, 545 (Tex. 2003)).  In adopting the Strickland
test for parental termination cases,
the Texas Supreme Court has explained that, “taking into account all of the
circumstances surrounding the case,” a court “must primarily focus on whether
counsel performed in a reasonably effective manner.”  Id.  A court “must give great deference to counsel’s
performance, indulging a strong presumption that counsel’s conduct falls within
the wide range of reasonable professional assistance, including the possibility
that counsel’s actions are strategic.”  Id.
 Challenged conduct constitutes
ineffective assistance only when it is “so outrageous that no competent
attorney would have engaged in it.”  Id.

          Appellant first argues
that her trial counsel “failed to file the required notice of points on appeal
or a designation of matters to be included in the record” and that such a
failure was “not a concession to any perceived lack of merit.”  See Act of June 15, 2001, 77th Leg., R.S., ch. 1090, 2001 Tex. Gen. Laws
1090 (amended 2011) (current version at Tex.
Fam. Code Ann. § 263.405 (Vernon 2008)) (requiring trial counsel to file
within fifteen days of trial court’s order “a statement of the points or points
on which the party intends to appeal”); In re J.O.A., 283
S.W.3d 336 (Tex. 2009) (holding failure of trial counsel to file statement of
points within statutory time-period was “seriously deficient”).  However, although trial counsel did not file
a document entitled “statement of points,” he did file a document entitled
“motion for reconsideration if necessary motion for new
trial/statement of parents notice of appeal (TFC 263.405).”  In this document, trial counsel both moved
for a new trial, citing section 263.405, and contended that the evidence is
legally insufficient to support a finding that appellant violated section
161.001(1).  Furthermore, appellant’s
counsel on appeal filed her own statement of points, also alleging legal
insufficiency of the evidence, ineffective assistance of counsel, and other
claims.  Because the trial court
considered all of these arguments in the hearing for a new trial, and because
this court has received a full record on appeal, any error by trial counsel in
failing to file a document entitled, “Statement of Points,” would be harmless. 

          Appellant also raises
several other claims of ineffective assistance of counsel, stating simply that
it “was not reasonable” for trial counsel to “waive [appellant’s] right to a
jury trial”; “fail to seek to compel discovery or special exceptions regarding
the grounds on which [DFPS] would be seeking to terminate [appellant’s] rights;
“fail to review [DFPS’s] report prior to trial in order to be able to make
objections to specific portions of the report on the basis of hearsay”; fail to
“seek an appearance by the psychiatrist treating [appellant], Dr. Plummer”;
“fail to present documentary or testimonial evidence to support [appellant’s]
testimony regarding her residence, employment, support system in Texas, or
other evidence of her stability”; and fail “to seek to locate Donald Tenney or
to determine whether Donald Tenney and [appellant] were married on the date” of
the birth of appellant’s son.  However, there
is no evidence in the record that appellant demanded a jury trial, any of the
above documents or evidence that appellant claims should have been offered were
available, or any of the above witnesses were available and willing to
testify.  Furthermore, appellant does not
explain how the above actions prejudiced her case.  Given the “strong presumption” that counsel’s
performance “falls within the wide range of reasonable professional assistance,
including the possibility that counsel’s actions are strategic,” we cannot say
on this record that counsel’s performance was “so outrageous that no competent
attorney would have engaged in it.”  See In re H.R.M., 209 S.W.3d at 111.  Accordingly, we hold that appellant has not
demonstrated that she received ineffective assistance of counsel.

          We overrule appellant’s first, second,
third, tenth, eleventh, thirteenth, fourteenth, and fifteenth issues.

Emergency Removal

          In her eighth issue, appellant argues
that there was “[n]o causal nexus shown between conditions in [appellant’s]
household and imminent danger to health, safety, or welfare of children” and,
as a result, there is insufficient evidence to support DFPS’s emergency removal
of the children from her custody.  See Tex.
Fam. Code Ann. § 262.201 (Vernon 2008) (stating that, following an emergency
removal, trial court must return children to parent’s custody unless provisions
of section 262.201 are satisfied).  Here,
the trial court, on May 6, 2009, entered an “order for protection of a child”
for both of appellant’s children, authorizing their emergency removal.  However, since that date, the trial court has
entered a final order terminating the parental rights of appellant to her
children.  Because a final order has been
entered in the case, appellant’s complaints regarding a temporary order are
moot.  See Rafferty v. Finstat, 903 S.W.3d 374, 378 (Tex. App.—Houston
[1st Dist.] 1995, writ denied) (“In general, temporary orders of a trial court
issued during the pendency of a proceeding are superseded by the trial court’s
final order.”); Wright v. Wenzel, 749
S.W.2d 228, 234 (Tex. App.—Houston [1st Dist.] 1988, no writ) (declining to
address issues related to temporary orders because trial court had entered
final order).  

          We overrule appellant’s eighth issue.         

Remaining Issues

          Under the section of her brief entitled, “Issues Presented,”
appellant contends in her seventh, ninth, and twelfth issues that the “final
order in each case fails to expressly state the specific statutory basis for
termination,” the evidence is insufficient “to prove that the Department sought
to accomplish reunification or relative placement,” and “[d]enial of due
process; termination based on improper factors.”  Although these issues are listed as “Issues
Presented,” there is no substantive discussion of these issues in the
brief.  Accordingly, we do not address
these issues as they are inadequately briefed. 
See Tex. R. App. P. 38.1.

 

 

 

 

 

Conclusion

          We affirm
the judgment of the trial court.

 

                                                          

 

 

                                                                   Terry
Jennings

                                                                   Justice


 

Panel consists of Justices Jennings,
Massengale, and Huddle.

 











[1]
          See Tex. Fam.
Code Ann. § 263.045(a) (Vernon Supp. 2011).

 





[2]
          See id.
§ 161.001(1)(D) (Vernon Supp. 2011).

 





[3]
          See id. § 161.001(1)(E).

 





[4]
          See id. § 161.001(1)(O).

 





[5]
          See id. § 161.001(2) (Vernon 2008).

 





[6]
          See Tex. Fam.
Code Ann. § 262.104 (Vernon 2008) (authorizing DFPS to take possession of child in
emergency without court order in certain instances).

 





[7]           See
id.

 





[8]
          See Tex. Fam.
Code Ann. § 262.201 (Vernon 2008).





[9]
          We note initially that DFPS
argues that because appellant retained counsel at trial, she cannot assert a
claim of ineffective assistance of counsel on appeal because “the right to
effective counsel” is based on the “statutory right to counsel for indigent parents.”  However, in a case where DFPS made the same
argument and alleged that a parent had retained counsel at the trial level,
this Court addressed the parent’s claim of ineffective assistance of counsel.  See In
re V.V., 349 S.W.3d 548, 558–61
(Tex. App.—Houston
[1st Dist.] 2010, pet. denied).