**Affirmed and Opinion Filed February 1, 2018**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-17-00539-CV
_____

### IN THE INTEREST OF A.R.M., A CHILD

**On Appeal from the 330th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-13-09646**

## MEMORANDUM OPINION

Before Justices Fillmore, Whitehill, and Boatright
Opinion by Justice Whitehill

During their divorce case, Father sought to terminate Mother's parent–child relationship with their daughter. The termination issue was tried to a jury, which found against Mother. The final divorce decree terminated her parent–child relationship with Daughter. Mother raises five issues. Four issues challenge the sufficiency of the evidence, and the fifth issue concerns evidentiary rulings during trial.

An important question here is whether evidence suggesting that Mother coached Daughter to make false sex abuse outcries against Father, otherwise attempted to undermine Father's relationship with Daughter, planted surveillance devices on Daughter for her supervised visits with Father, and violated both court orders and supervised visitation rules is legally sufficient to prove by clear and convincing evidence that Mother's behavior endangers Daughter's emotional health

and that terminating Mother's parental relationship with Daughter would be in Daughter's best interest. Based on the evidence in this record, we conclude that the answer to that question in this case is yes. We therefore affirm the trial court judgment.

## I. Procedural History

In May 2013, Father sued Mother for divorce. He alleged that Daughter was born in 2010 and that the couple married in 2011. He asked to be appointed Daughter's sole managing conservator.

Mother answered and countersued for divorce. She asked to be appointed Daughter's sole managing conservator and that Father be denied access to the child.

A few months later, Mother amended her pleadings and sought to terminate Father's parent–child relationship with Daughter.

Father later filed a counter-petition to terminate Mother's parent–child relationship with Daughter.

Although Mother nonsuited her request to terminate Father's parent–child relationship a few days before trial, Father did not reciprocate. After a three-day trial, the jury found by clear and convincing evidence that (i) Mother endangered Daughter's physical or emotional well-being or knowingly placed her with persons who so endangered Daughter and (ii) terminating Mother's parent–child relationship with Daughter was in the child's best interest.

Mother moved for judgment notwithstanding the verdict. The trial court denied the motion and signed a final divorce decree that terminated Mother's parent–child relationship with Daughter based on the jury's verdict.

## II. Issues Presented and Error Preservation

Mother asserts these issues:

Issues one and two attack the legal sufficiency of the evidence supporting the jury's endangerment and best interest findings. Mother's motion for judgment notwithstanding the verdict preserved these issues in the trial court. We overrule these issues.

Issues three and four attack the factual sufficiency of the evidence supporting the jury's two findings. Factual sufficiency issues must be preserved by new trial motion. TEX. R. CIV. P. 324(b)(2). Mother did not file a new trial motion, so we overrule issues three and four for non-preservation.

Issue five complains that the trial court committed evidentiary error. We conclude that the trial court did not abuse its discretion and any error was harmless.

### III.  ISSUES ONE AND TWO:  LEGAL SUFFICIENCY OF THE EVIDENCE

**A.  Standard of Review**

Because terminating parental rights implicates fundamental interests, the clear and convincing standard of proof is used in termination cases. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). "Clear and convincing evidence" is the measure or degree of proof that will produce in the factfinder's mind a firm belief or conviction as to the truth of the matter to be proved. TEX. FAM. CODE § 101.007.

Our standard of review reflects the elevated burden at trial. *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.). Specifically, we consider all the evidence to determine whether the factfinder could reasonably form a firm belief or conviction that the termination grounds were proven. *Id.* Although we consider all the evidence and not just the evidence favoring verdict, we (i) view the evidence in the light most favorable to the finding, (ii) defer to the factfinder's determinations as to witness credibility, and (iii) disregard all contrary evidence that a reasonable factfinder could have disbelieved or deemed incredible. *Id.*

**B.      Applicable Law**

The trial court may terminate the parent–child relationship if the factfinder finds by clear and convincing evidence that (i) the parent committed one or more acts or omissions enumerated in family code § 161.001(b)(1) and (ii) termination is in the child's best interest. FAM. § 161.001(b).[1] In this case, the jury found that Mother engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child, which is grounds for termination under § 161.001(b)(1)(E). "Endanger" means to jeopardize the child's emotional or physical health or to expose it to loss or injury. *In re N.T.*, 474 S.W.3d at 476. It is not necessary that the conduct be directed at the child or that the child actually suffer an injury. *Id.* However, termination under subsection (E) must be based on a voluntary, deliberate, and conscious course of conduct by the parent; a single act or omission is not enough. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied).

As for the best interest element, the supreme court identified a nonexclusive list of factors that may be relevant, depending on the facts: (i) the child's desires, (ii) the child's current and future emotional and physical needs, (iii) current and future emotional and physical dangers to the child, (iv) the parental abilities of those seeking custody, (v) the programs available to help those individuals promote the child's best interest, (vi) those individuals' plans for the child, (vii) the home's or proposed placement's stability, (viii) the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one, and (ix) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). An absence of evidence of some *Holley* factors does not preclude a finding that termination is in the child's best interest, particularly if undisputed evidence shows that the parental relationship endangered the child's

---

[1] The pertinent provisions of § 161.001 have been renumbered since this case was filed in the trial court, but their substance is unchanged. Accordingly, we cite the current version of the statute.

safety. *In re N.T.*, 474 S.W.3d at 477. The jury was instructed that it could consider the *Holley* factors in making its findings.

The same evidence can be relevant to both § 161.001(b)(1) termination grounds and the child's best interest. *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied).

## C. The Evidence

### 1. The Early Part of the Relationship

According to Father, his relationship with Mother was good in the early going. They started dating in January 2010, and they started having sex a few weeks later. Mother became pregnant with Daughter in April 2010, and Mother and Father got engaged that May. Father also moved into Mother's rental home in May. Daughter was born in December 2010, and Father and Mother married the following month. Their relationship was loving and caring in 2011, although Mother was possessive and obsessive about Daughter and would not let her spend the night with Father's parents. Father's relationship with T.H., Mother's son from a prior marriage, was strained from early in the relationship.

According to Father, things deteriorated quickly after August 2012, when the family moved into a new house in another town. Buying the house overextended the family financially, and Father's quality of life grew worse as his work pressures increased and Mother and her mother challenged his manliness because he was not an adequate provider. His relationship with T.H. also worsened, and Mother (who had previously supported Father when dealing with T.H.) began siding with T.H. when he and Father argued. Father later learned that Mother secretly recorded some of his arguments with T.H. By October 2012, Father began staying with his parents sometimes, and Mother and Father were seeing a family therapist.

According to Mother, however, she did not have sex with Father until late April 2010, when he forcibly raped her in her home. She further testified that she had consensual sex with

Father only once, and that was based on a counselor's advice; every other time they had sex was rape. She never loved Father after he raped her the first time. Nevertheless, she allowed him to move in with her and T.H., and she later married Father. When asked why she chose to marry Father after Daughter was born, Mother answered:

> Based on my religion and my background, I had to have—being able to raise my children, I had to have a clear conscience. I had to have peace, I had to forgive and I had to move on. And at this point, it was just at me. It was just—the abuse was just at me. And when I say "abuse," I'm talking rape.

(There were several handwritten love notes from Mother to Father in 2011 that belied her rape testimony. The jury could have reasonably believed her handwritten notes instead of her trial testimony and drawn adverse inferences toward Mother's credibility based on those discrepancies.)

According to Mother, her relationship with Father was "very trying" after Daughter was born. Father walked out on the family quite a bit and did not want to support Daughter or her needs. And he was becoming more abusive to T.H., Mother, and ultimately Daughter. Mother also testified that as early as August or September 2012 she suspected that Father was sexually abusing Daughter.

## 2. The Altercation, the First State Investigation, and the Criminal Case

Father testified that on January 3, 2013, he and Mother argued about her buying clothes with money her family gave her even though they would receive a tax refund in a few weeks. T.H., who was then twelve years old, interjected himself into the argument, and Father sent him to his room. T.H. came back out, and Father sent him back again and followed him to make sure he stayed there. Father put his finger in T.H.'s face, and T.H. kicked at Father's chest. Father batted T.H.'s legs away while T.H. was continually "bicycle kicking" at him. The whole incident lasted about ten seconds. Father testified that his response to T.H. was inappropriate but it was not an

assault. After the incident, Father went to his parents' residence and never moved back into the house.

T.H., however, testified that Father's conduct was much more violent than Father described it. According to T.H., he was "choked and, basically, almost killed." Similarly, Mother testified that Father had one hand over T.H.'s nose and mouth and the other hand on his throat. But it was the jury's prerogative to assess the witnesses' credibility, and they could have believed Father instead of T.H. and Mother.[2]

There was also evidence that CPS (i) investigated Father regarding his altercation with T.H. and (ii) contacted him on May 3, 2013, about a different case against him involving Daughter. Father testified that this was the first time he heard about a case involving Daughter. However, a March 2013 report concerning the January 3, 2013 incident recited that the TDFPS's investigation had ruled out an allegation that Father had physically abused Daughter but concluded that there was reason to believe he had neglectfully supervised her.

Father and Mother exchanged text messages about the May 3 contact. During that exchange, Father asked whether Mother knew anything about the case against him regarding Daughter, and her responses were evasive despite his stated concern over this new information: "I can't take this. They're going to take my children away from me."

Father was later arrested in May 2013 for assaulting T.H. Father testified that he talked to Mother on the telephone while he was in jail. She talked to him about getting back together and said that divorce was not the answer. But then Father hired an attorney, who told him that Mother was "coming after" him and was pushing the district attorney to prosecute him. Father filed for divorce soon after learning this.

---

[2] Father also testified that Mother told him that she had T.H.'s father's parental rights terminated, in part, because he threatened violence toward T.H. and Mother, including threats to kill them.

Father was released on bond, and one bond condition was to stay away from T.H.'s family, which included Daughter. This remained the state of affairs until he was tried and acquitted in October 2014. After he was acquitted, he began to prosecute the divorce case.

### 3. The Sex-Abuse Investigations and the Custody Arrangements

The TDFPS received several reports that Father had sexually abused Daughter, but none of the resulting investigations led to any findings against him. At trial, Father testified that all the accusations that he did anything sexual to Daughter were lies.

Many TDFPS records were admitted into evidence, but some of the details about the various abuse reports, investigations, and conclusions are sketchy.

A 2014 TDFPS record contains a brief reference to a 2013 case that was apparently distinct from the January 2013 altercation investigation. An investigator wrote, "During the second case (4/16/13), the allegation of sexual abuse was made and after speaking with [Daughter's] pediatrician, the case was ruled out. [Mother] had never addressed this issue with the doctor and that [sic] he had been the children's physician for many years. I talked with [Father] regarding the allegation of sex abuse with [Daughter] during this case. He denied this and called it a viscious [sic] lie."

On June 24, 2014, there was a report that Father had sexually abused Daughter. The TDFPS closed its investigation two months later with a finding of "Unable to Determine." This investigation apparently concerned a claim by T.H. that he had seen Father "orally assault[] [Daughter's] privates on the changing table" in their house. The alleged assault presumably would have occurred between August 2012, when the family moved into the house, and January 3, 2013, when Father left the house after the altercation and did not return. At the time of the alleged assault, Daughter would have been two years old or a little less. At trial, Father denied that this

alleged assault ever happened and opined that T.H. made up the allegation on his own or with Mother's help.

The next reports seem to have come from Dr. Kristi Frye, a counselor, who testified at trial to the following facts. The court ordered Daughter to start therapy with Dr. Frye in October 2015 to help her reunification with Father. Daughter was almost five years old then, and she was not yet potty-trained.

At a December 15, 2015 therapy session, Dr. Frye asked Daughter directly about Father, and she "described him as a bad man . . . who might come in her window at night [and] steal her & her mom would never see her again."

They had another session on December 29, 2015. Dr. Frye's notes of that session contain this description:

> At 10 minute reminder client abruptly stop[s] play behavior & says "Oh, I almost forgot I am supposed to tell you something about the bad man[.]" I asked do you want to tell me about him? She shook her head no and said "I am supposed to tell you what he did you know on the changing table[.]" I told her she can tell me about what happened & she said "When he put his finger & his mouth on my privates[.]" Discussing her feelings about it she said it was "disgusting & felt like when the doctor touched her privates[.]" She said she knew it was [Father] who did it because "I saw him do it over there (pointed across the room) by the changing table[.]" I asked if it happened when she was younger or recently. Hasn't seen F since she was 2. She seemed surprised & said "2? I don't remember being 2. Don't you know I'm 5?" Will f/u [with] CPS. M reports this has been investigated & closed.

Dr. Frye's notes showed that she later called the CPS hotline with this information. A caseworker called her back and "explained this was not a new outcry[. It] had previously been investigated & ruled out."

Two months later, Daughter temporarily stopped seeing Dr. Frye.

In March 2016, the court granted Father supervised visitation with Daughter. Father testified that he asked for the visitation to be supervised to protect himself from further allegations. At first, Daughter's court-appointed amicus supervised the visits. But in May 2016 the court

allowed Father's parents to supervise the visits instead. Father's parents both testified that Father was never left alone with Daughter from May through November 2016.

Dr. Frye testified that her therapy sessions with Daughter resumed in June 2016. Dr. Frye met with Mother before starting a June 7, 2016 session. Dr. Frye's handwritten notes from that date recite that:

> Met [with] mom before session for update. M reports client told her that at a supervised visit (6 hr) [Father] touched her private area while on the couch at his house while watching Lion King. M reports she has an audio of client describing it but her attorney said they should save it for court[.] Will f/u [illegible] client during session[.]

Dr. Frye's handwritten summary of her session with Daughter that same day says that Daughter talked about her visits with Father and gave some details about those visits but made no mention of the incident Mother had described.

Dr. Frye saw Daughter again on June 14, 2016. According to her related notes:

> Client entered session rather than beginning [with] regular play behavior she sat down & stated "Did you hear about [Father]?" "Do you know [Father and his parents]?" Answered I had met [Father] but not her grandparents. She continued "I hate to be the one to tell you this but I was watching the Lion King & [Father] touched my privates." Tried to discuss [with] client other details of situation but she had no further information. Attempted to process her feelings about what happened that day but she stated "it felt like when I was on the changing table." She expressed frustration & confusion when she said "and he stole our house & that is why we had to move." Ø emotional tie to either recent event described or past not consistent [with] repression or block but devoid. Client then abruptly began regular play behavior & able to express & discuss positive emotions during remainder of session.

Two days later, Dr. Frye reported Daughter's outcry on the CPS hotline. It is not entirely clear how CPS disposed of the matter, but an "investigation report" admitted into evidence suggests that the matter was administratively closed a few days later. That report states: "Worker approved to administratively close case. These allegations were previously addressed in a previous investigation. Mother and father are having a custody battle. There are monitored visits and *the abuse is not likely to have occurred*." (Emphasis added.)

–10–

The records also state, "[Daughter] reports the incident as someone who saw something in a movie. [She] shows no indication as a child who has been molested and is not afraid of Father."

The Investigative Reports further say that, although Daughter allegedly made the outcry on or before June 7, Mother (i) did not report the outcry to law enforcement, (ii) allowed her to have two more visits with Father after the outcry, and (iii) did not mention the outcry when she spoke to Daughter's ad litem on June 10.

Dr. Frye's notes from a June 21, 2016 therapy session with Daughter indicate that someone told Daughter to say more negative things about Father:

> Met [with] client who entered session & stated "I'm supposed to tell you I forgot to tell you that at McDonald's [Father] called me a "little bitch" and a "trashy person." She then went on with her regular play activities talked about grandparents & great-grandmother & recent visits with father[.] No mention of incident or inappropriate behavior.

TDFPS records suggest that on June 27, 2016, someone else reported the same *Lion King* allegation. The Investigation Report indicates that this investigation was concluded in two days. The report further says: "I staffed the new referral received on 6/28/16 [sic] with Ms. Vasquez and updated her on the history of the family. I informed her that these same allegations have been reported at least 3 times *and it appears as though the mother is coaching the child and wants her current husband/paramour to adopt this child and does not want her to see her father anymore*." (Emphasis added.)

Another TDFPS record indicates that there was a July 9, 2016 report about possible abuse of Daughter and that TDFPS investigated Mother, Father, and Father's parents. Daughter and Mother were interviewed on July 13. A record recites that Daughter's interviewer and two observers "were in agreement that it appears as though [Daughter] has been coached on the incident, and is unable to provide more details as to what took place." Records about the investigation also report that: "[Daughter's] forensic interview appeared to be coached and there

–11–

were inconsistencies between [Mother] and [Daughter's] interviews." The investigation ended with a finding "Unable to Determine" if Father sexually abused Daughter.

The next TDFPS record indicates there was a September 18, 2016 report that Father was allegedly abusing both Daughter and T.H. Daughter was forensically interviewed in September 2016, apparently regarding this report. The investigation was administratively closed less than two weeks after intake.

In November 2016, an associate judge signed an order that essentially reversed the custody arrangement. The order appointed Father temporary managing conservator, gave Mother only supervised visitation with Daughter, and set the case for trial on March 29, 2017. The order was admitted into evidence.

Furthermore, Dr. Frye testified that Daughter recanted her June 14 outcry during a January 2017 therapy session. According to Dr. Frye's notes, during the session Daughter asked, "If I tell you something will you still like me[?]" The notes continue as follows:

> Reassured her she can share whatever she chooses in her session. She said to therapist "I played a joke on you[.]" Client explained that when she told therapist F touched her privates that she was telling an April Fools Joke. Discussed inappropriate touch & client now denies any adult, teenager or other child has ever touched her private areas except for when parents have to change a baby's poopy diapers.

Dr. Frye testified that Daughter felt like she had told Dr. Frye something that was not true, and she wanted Dr. Frye to know that.

TDFPS investigator Tyler Redman testified that on March 17, 2017, he received a referral of abuse and neglect about Daughter. The referral involved a claim that Daughter did not appear to be clean and that she smelled bad. The allegation also included concerns that Daughter was living with Father, who had sexually abused her. He did not know who made the allegations. In his investigation, he found that several professionals had been around Daughter in the previous thirty days, with some as recent as seven days earlier. He spoke with Daughter's amicus attorney,

–12–

who told him about her conversations with Dr. Frye. Based on the statements from professionals that there had been no recent concerns about Daughter's physical state or home environment, the case was closed.

### 4. Additional Testimony from Dr. Frye

Regarding Daughter's December 2015 outcry against Father, Dr. Frye testified that Daughter (then five years old) was supposedly reporting abuse that happened when she was between eighteen and twenty-four months old. Dr. Frye testified that it is generally unlikely for a child to remember that far back. In her nineteen years of experience, she had never had anyone tell her "a working memory of diaper changing." Dr. Frye also testified that when Daughter made the outcry she was "just making the statement" and there was no "tearfulness, being upset, feeling of, you know, shameful, whispering."

Dr. Frye also testified about the dangers posed when a parent coaches a child to make false allegations against the other parent. She said that such conduct would "present emotional problems" and that the allegation would become part of the child's "working memory." She agreed that with a child from four and a half to six years old it would be "particularly dangerous" for false allegations to become part of her working memory. The child would believe she had really experienced the events, and it would not be difficult for a parent in possession of the child to plant such memories in a child.

Dr. Frye also indicated that Daughter's June 14, 2016 outcry was unusual. Daughter entered the session, sat on the couch in the adult area rather than going to the play area, made the statement, and then went about the rest of the session with no other mention or discussion of it. Furthermore, she said that in younger children, typically an outcry comes up in the course of other activities, such as playing with dolls and reenacting something that children should not know about. She said, "It rarely starts with just a statement of a fact." In describing Daughter's January

2017 recantation of the June 2016 outcry, Dr. Frye testified, "[Daughter] felt like that she had told me something that wasn't true and she wanted me to know that it wasn't true." And she said that it is "emotionally dangerous for a six year old" if a parent were to instruct her to make false outcry allegations like those Daughter made on June 14, 2016.

Dr. Frye also testified that it would have a "negative impact" if there were continual false allegations of sexual assault that kept the parties "warring in court for [Daughter's] entire adolescence." She agreed that the emotional dangers presented by a parent's creating false working memories or coaching specific allegations could warrant terminating parental rights in some cases. And she agreed that it is "emotionally dangerous to a child for one parent to try to eliminate another parent from that child's life with no reason to do so."

On cross-examination, Dr. Frye agreed that it was fair to say that Daughter "appears to be doing well under either the control of the mother or under the control of the father." She also agreed that Daughter was "remarkably unscathed" by the process.

Under questioning by Daughter's amicus attorney, Dr. Frye testified that Daughter's behavior was not consistent with someone who has experienced sexual abuse. She also said that vilifying another parent would be damaging to a child and that the damage would be lifelong. She also testified that it is abusive and damaging to a child to alienate the child from a parent.

### 5.    Other Evidence Regarding Mother's Parental Fitness

There was evidence indicating that Mother planted devices on Daughter allowing Mother to communicate with Daughter during her visits with Father in 2016. Father's father testified that at first Daughter wore a pink watch that "would allow [Mother] to keep tabs on her." He also said that Mother and Daughter could communicate through the watch. Mother stipulated that at some point the court ordered that Daughter was not allowed to wear or have a watch provided by Mother during Daughter's visitation with Father.

Father's father additionally testified that Daughter later came to a visit with a walkie-talkie in her pocket that was the same device as the watch. He also said that Mother tried to keep Daughter's school a secret from Father.

When the court ordered Mother to have only limited supervised visitation with Daughter, it appointed Family Affairs Supervised Visitation to supervise those visits. Family Affairs' owner, Cynthia Burleson, testified that there were some problems during Mother's visits. For example, Mother was admonished several times about whispering to Daughter, which was against the rules, but she continued to do it. And sometimes Mother brought unauthorized people to the visits. On another occasion, Mother and Daughter went to the bathroom together, and when they returned Daughter told Burleson that Father's girlfriend was an alcoholic. Burleson asked her if she knew what "alcoholic" meant, and Daughter said, "No, my mommy told me to say that." Finally, Burleson testified that Daughter was happy to see Father when he would pick her up from visitation, and there has been no indication that Daughter was being harmed while she was with Father.

Moreover, Father testified that Mother sent notes to Daughter at school despite a court order that Mother not communicate with Daughter except during supervised visitation. He also testified that Mother interfered with Daughter's homework.

Finally, as of trial, Mother had not exercised her supervised visitation in about six weeks. Family Affairs would not schedule any visits because Mother owed a $240 case-management fee. Although Mother testified that she did not have the money to pay for her visitation, she admitted to having cable TV and paying that bill.

## D. Issue One: Was the endangerment evidence legally sufficient?

We first consider whether there is legally sufficient clear and convincing evidence that Mother engaged in conduct that endangered Daughter's physical or emotional well-being. *See*

FAM. § 161.001(b)(1)(E). We conclude that the evidence is legally sufficient because there is evidence that (i) Mother was coaching Daughter to lie about Father, intentionally undermining Daughter's relationship with him, and having Daughter eavesdrop on Father; and (ii) Mother's behavior could endanger Daughter's emotional health long-term.[3]

First, the jury could reasonably form a firm belief or conviction that Mother engaged in an ongoing campaign to coach Daughter to make false accusations of sexual abuse and other abusive or negative behavior against Father that could in turn harm Daughter's emotional health and well-being.

Specifically, substantial evidence supported the inference that Mother coached Daughter (and T.H.) to falsely accuse Father of sexually abusing Daughter. For example, Daughter told her therapist, Dr. Frye, about a supposed incident of sexual abuse on a changing table when she was under the age of two, but Dr. Frye said it was unlikely she would have remembered something from such a young age. Also, Daughter made the outcry about that alleged event (i) more than two years after the last time she saw Father, (ii) without showing any emotional upset, and (iii) after specifically saying that she had been told to tell the therapist about the alleged incident. Finally, Father denied ever sexually abusing Daughter and the jury believed him. The jury thus could reasonably infer that Mother told Daughter to make the accusation.

Additionally, Daughter told Dr. Frye about another supposed sexual abuse incident that allegedly occurred in 2016 when she was five years old. Dr. Frye's notes suggest that the outcry was coached because of the unusual way Daughter raised the subject, her lack of detail about it, and her lack of emotional connection with the story. Moreover, Daughter later recanted the outcry. TDFPS records state that "it appears as though the mother is coaching the child."

---

[3] The jury charge also allowed the jury to find that Mother's rights should be terminated if she knowingly placed Daughter with persons who endangered her well-being. Because the evidence is sufficient that Mother herself endangered Daughter's well-being, we need not address this alternative basis for termination.

–16–

The evidence also suggests that Daughter was coached to tell Dr. Frye in June 2016 that Father called her a "little bitch" and a "trashy person." Specifically, Daughter prefaced her report by saying, "I'm supposed to tell you I forgot to tell you." Another TDFPS record from July 2016 recites that three people agreed that it appeared Daughter had been coached on an unspecified incident.

Furthermore, there was evidence that during a supervised visit in or around early 2017 Mother told Daughter that Father's girlfriend was an alcoholic.

Moreover, there was evidence that Mother was causing Daughter to use two-way communication devices to monitor Father during his visits with her.

And Dr. Frye testified that it causes emotional problems for a parent to coach a child to make false allegations against the other parent. When a child is around four and a half to six years old, it is particularly dangerous for a parent to tell the child false accusations and make those accusations a part of the child's working memory. One parent's vilifying the other parent would be damaging to a child and would cause lifelong damage. It is damaging to alienate a child from a parent.

Finally, we note the evidence that Daughter's various outcries led her to be interviewed by TDFPS three or four times and to have a "SANE exam" that involved having photographs taken of her genitals. A jury could infer that such repeated interviews about false outcries could harm Daughter. Father's father testified that he thought it was harmful to Daughter to be interviewed repeatedly.

On the other hand, Mother argues that the evidence of endangering conduct is insufficient because the evidence here is less extreme than that presented in the somewhat similar case of *In re S.D.*, No. 02-16-00280-CV, 2017 WL 56167 (Tex. App.—Fort Worth Jan. 5, 2017, no pet.) (mem, op.). This is a non sequitur. Although it is true that the *S.D.* court affirmed a termination

order based on evidence of facts more extreme than those presented here, that does not address whether the evidence in this case is legally insufficient to carry Father's burden. That more facts were sufficient there does not mean that lesser facts here are insufficient. Furthermore, many factors can support an endangerment finding, including not only violence and drug use but also a parent's failure to complete a court-ordered service plan, missed visits with the child, and conduct that generally subjects a child to a life of instability and uncertainty. *In re D.A.*, No. 02-15-00213-CV, 2015 WL 10097200, at *5 (Tex. App.—Fort Worth Dec. 10, 2015, no pet.) (mem. op.). Indeed, we have upheld an endangerment finding on evidence somewhat similar to the evidence presented in this case. *See In re J.K.F.*, 345 S.W.3d 706, 712–15 (Tex. App.—Dallas 2011, no pet.).

The bottom line question is whether a jury could reasonably form a firm belief or conviction that Mother engaged in a voluntary course of conduct that endangered Daughter's emotional well-being. Based on the totality of the evidence detailed above, we hold that the evidence of endangerment was legally sufficient and overrule Mother's first issue.

**E.        Issue Two:  Was the best interest evidence legally sufficient?**

Next we consider whether there is legally sufficient clear and convincing evidence that Daughter's best interest would be served by terminating Mother's parental rights. *See* FAM. § 161.001(b)(2); *Holley*, 544 S.W.2d at 371–72. We conclude that there is.

The first *Holley* factor is Daughter's desires. There does not appear to be any direct evidence of Daughter's desires, or that she is even aware of the significance of the ongoing legal processes.

The second factor considers the child's emotional and physical needs. There was evidence that she was doing very well living with Father. Dr. Frye testified that Daughter had not suffered any ill effects from not living with Mother for the preceding four months. On the other hand, Dr.

Frye also testified that Daughter appeared to be doing well whether she lived with Mother or Father. Nevertheless, the evidence viewed in the light most favorable to the verdict supports the premise that separating Daughter from Mother would help satisfy Daughter's emotional and physical needs.

The third factor considers the physical and emotional dangers to the child. We have already discussed the endangerment evidence in detail and concluded that evidence supports the premise that not terminating Mother's parental rights will endanger Daughter's emotional well-being.

The fourth factor considers the parent's parental abilities. The evidence that Mother coached Daughter to make false sexual abuse allegations, disparaged Father to Daughter as a "bad man," disparaged Father's girlfriend to Daughter during a visit, and had Daughter carry communication devices to supervised visits supports a conclusion that Mother's parental abilities are poor. Similarly, the evidence that Mother disobeyed court orders and the rules governing her supervised visitation with Daughter tends to show that Mother lacked maturity and self-discipline. There was also testimony from Mother's family members and boyfriend that she is a good, loving mother, but the jury was entitled to weigh and discount this evidence.

The fifth factor considers whether there are programs available to assist Mother promote Daughter's best interest. There was no evidence of this factor.

The sixth factor considers the plans for Daughter by Mother or the agency seeking custody, which is effectively Father in this case. There was no evidence that Mother had any particular plans for Daughter. And there was evidence that Daughter was doing well in Father's custody. To the extent there is any evidence of this factor, it supports the verdict.

The seventh factor considers the stability of the home or the proposed placement. Again, there was evidence that Daughter was doing well in Father's custody. This factor supports the jury's decision.

The eighth factor considers Mother's acts or omissions showing that her relationship with Daughter was not a proper one, and the ninth factor considers any excuses for Mother's acts or omissions. Again, we discussed this evidence in detail in part III.C above, and it does not show any excuse for Mother's acts or omissions.

Reviewing the evidence in the light most favorable to the jury's finding, we conclude that the jury could have reasonably formed a firm belief or conviction that terminating Mother's parental rights was in Daughter's best interest. *See In re J.K.F.*, 345 S.W.3d at 715–16 (upholding best interest finding on similar facts). We thus overrule Mother's second issue.

## IV. ISSUE FIVE: EXCLUSION OF EVIDENCE

### A. Standard of Review

We review a trial court's ruling that excludes evidence for abuse of discretion. *In re Estate of Miller*, 243 S.W.3d 831, 836 (Tex. App.—Dallas 2008, no pet.). We uphold the ruling if there is any legitimate basis for it. *Id*. at 837.

### B. Relevant Facts and Procedural History

Mother complains about the exclusion of three exhibits concerning Daughter's June 2016 outcry against Father. Mother's Ex. 30 was a pair of crayon drawings by Daughter. Each drawing depicts two stick figures. In one drawing, the two stick figures are close together inside a house, and there is a sad face drawn to the side. In the other, the two figures are overlapping. In our view, there is no way to tell from the drawings alone what the figures are supposed to be doing. Mother's Ex. 31 was an audio recording, purportedly of Daughter's outcry to Mother on June 4, 2016. Mother's Ex. 32 was a written transcript of the conversation between Mother and Daughter recorded in Mother's Ex. 31.

The attorneys briefly discussed these exhibits in a pretrial hearing on the first day of trial. According to Mother's counsel, Mother offered the same exhibits at a prior hearing, and the court

–20–

excluded them. Father's counsel explained that he made a document request covering these exhibits roughly six months earlier, and Mother did not produce them until the hearing at which the court first excluded them. Mother's counsel requested an extension of the discovery deadline to the extent necessary to make the exhibits admissible, which the trial court denied.

The exhibits came up again on the third day of trial when Mother was testifying about Daughter's alleged June 4, 2016 outcry against Father. Mother testified that: On June 4, 2016, immediately after Father had a supervised visit with Daughter, Daughter told Mother that her genital area hurt and she wanted Mother to look at it. Mother did so and saw that "her lips were raw and . . . she had a vaginal opening." Daughter also told Mother that Father had threatened to kill her. Mother put some medicine on Daughter and emailed her lawyers, who replied that she should report the incident to Daughter's therapist but not report it to law enforcement or CPS or take Daughter to a hospital. Daughter brought Mother a picture. When Mother's attorney asked her what feeling came over her when she saw the picture, Father objected, the jury was retired, and the trial court held a hearing about all three contested exhibits.

Father objected to all three exhibits on the ground that they had not been timely produced in discovery. He argued that (i) in October 2013 he made a document request that encompassed the three exhibits, (ii) in August 2016 he made a second request for documents that also included the three exhibits, and (iii) he did not receive the three exhibits until on or about February 18, 2017. Father appeared to agree that the parties agreed to extend the discovery cut-off to March 6, 2017.

Mother argued that Father was not surprised because he knew there was a recording since it was mentioned in Dr. Frye's notes. Mother further argued that those notes were admitted into evidence at a February 20, 2017 hearing.

The amicus attorney for Daughter then objected to the recording and the transcript as hearsay.

The trial court then excluded the exhibits from evidence. Soon thereafter, the judge said, "30, 31, and 32 are—the objection is sustained."

## C.    Analysis

Mother argues that the trial court erred by sustaining Father's objection because Mother supplemented her discovery responses with the three exhibits (i) immediately after her new counsel appeared for her in the case and (ii) more than thirty days before trial. For the following reasons, we conclude that the trial court did not abuse its discretion and any error was harmless.[4]

### 1.    The trial court did not abuse its discretion.

Texas Rule of Civil Procedure 193.6(a) provides:

A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified, unless the court finds that:

(1)  there was good cause for the failure to timely make, amend, or supplement the discovery response; or

(2)  the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

TEX. R. CIV. P. 193.6(a).

Mother does not dispute that Father's October 2013 and August 2016 requests for production covered the materials contained in her Exs. 30 through 32. Those materials were not produced until February 2017, which was not timely as a matter of initial production. *See* TEX. R. CIV. P. 196.2(a) (responses are generally due thirty days after request is served). Thus, the materials were subject to exclusion under Rule 193.6(a) unless the February 2017 production was a timely supplemental response.

The supplementation rule provides:

---

[4] Mother does not address the amicus attorney's hearsay objection to two of the three exhibits. Although this failure could provide an alternative ground for affirmance as to those two exhibits, we address Mother's argument as to all three exhibits.

> An amended or supplemental response must be made reasonably promptly after the party discovers the necessity for such a response. Except as otherwise provided by these rules, it is presumed that an amended or supplemental response made less than 30 days before trial was not made reasonably promptly.

TEX. R. CIV. P. 193.5(b). The question, then, is whether Mother's February 2017 supplementation was made "reasonably promptly" after she discovered the need to supplement. *See id.* Although that supplementation occurred more than thirty days before trial, "there is no presumption that an amended disclosure made more than thirty days prior to trial is timely." *In re Staff Care, Inc.*, 422 S.W.3d 876, 881 (Tex. App.—Dallas 2014, orig. proceeding).

Here, the trial court could have reasonably concluded that Mother did not supplement her discovery responses reasonably promptly after discovering the need to supplement. The materials in question were purportedly created on June 4, 2016. Father served a document request covering them in October 2013. Any doubt about whether the items were responsive to that request was dispelled in August 2016 when he served a second request seeking, among other things, all documents and audio recordings supporting Mother's claim that Father had sexually abused Daughter.

The materials were thus in Mother's possession for about eight and a half months before she finally supplemented regarding the first request (and six months before she produced them in response to the second request). Mother produced no evidence that she was unaware that the materials in question needed to be produced or showing when she supposedly discovered the need to supplement, although she hired new lawyers at some point before February 18, 2017, and they made the supplemental production. Under these circumstances, the trial court could reasonably conclude that (i) Mother's supplementation was not made reasonably promptly after she discovered the need to supplement, so (ii) the materials in question were not disclosed in a "timely manner" under Rule 193.6(a), and (iii) they were subject to the automatic exclusion rule.

Mother suggests that her supplementation did not cause unfair surprise or unfair prejudice to Father, so the trial court should have invoked Rule 193.6(a)(2)'s exception to the exclusionary rule. She asserts that (i) Father's counsel received the supplementation more than thirty days before trial and (ii) Father did not argue he would need a continuance if the evidence were admitted. But Mother bore the burden to prove the lack of unfair surprise or unfair prejudice. *In re Staff Care*, 422 S.W.3d at 881. The only discussion of surprise we see in the record consists of (i) Mother's suggestion that Father should have known about the materials in question because they were mentioned in Dr. Frye's notes, which were admitted into evidence at the February 20, 2017 hearing, and (ii) Father's response that he did not look at Dr. Frye's notes until probably a day before trial.

We conclude that (i) the trial court did not act unreasonably by concluding that Mother failed to show lack of unfair surprise or unfair prejudice to Father from the late supplementation and (ii) thus the trial court did not abuse its discretion by excluding Mother's Exs. 30 through 32.

### 2. Any error was harmless.

Furthermore, we conclude that any error in excluding the three exhibits in question was harmless because the exhibits were generally cumulative and not crucial to a key issue in the case.

Rule 44.1 provides that error is not reversible unless it "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a)(1). In a case of evidentiary error, we must review the entire record and consider the state of the evidence, the case's strengths and weaknesses, and the verdict. *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 165 (Tex. 2015). Erroneous exclusion of evidence is likely harmful if the evidence was crucial to a key issue. *Id*. It is likely harmless if the evidence was cumulative or if the rest of the evidence was so one-sided that the error likely made no difference. *Id*.

The audio recording and transcript recount a conversation between Mother and Daughter on June 4, 2016 in which Daughter made an outcry that Father had sexually assaulted her while they were watching *The Lion King*. The conversation consisted largely of Mother's questions and Daughter's answers. For example, Mother asked Daughter what a "green thing" on a drawing depicted, and Daughter answered, "He's touching my private and putting it down my pants on my privates and rubbing it." At another point, Mother said, "He put his finger in you," to which Daughter replied, "He put in—his finger in me." Later Mother asked Daughter where Father's parents were, and Daughter answered, "They was—they were going to the bathroom."

As previously mentioned, the two drawings that were excluded were stick figure drawings that do not clearly depict any particular activity. Their exclusion was not harmful unless the exclusion of the audio recording or transcript was harmful.

We conclude that the audio recording and the transcript of the June 4, 2016 conversation were largely cumulative of other evidence regarding this outcry by Daughter. Dr. Frye testified that Mother told her about this outcry a few days after it happened, and Daughter made the same outcry to Dr. Frye on June 14, 2016. These reports described by Dr. Frye included some of the same details as the excluded exhibits. Mother also testified about Daughter's outcry to her, and her testimony included some of the same details as the excluded exhibits. Thus, the excluded exhibits were cumulative of other evidence that Daughter made an outcry to Mother in early June 2016, and they were cumulative of some of the details of that outcry.

Moreover, the excluded exhibits also were not especially probative as to the key issue, which is whether Mother was coaching Daughter to make false accusations. That is, there is nothing about these exhibits tending to show that the drawings and the recorded conversations were not themselves coached. So admitting the exhibits would not have aided the jury in determining whether Daughter's outcries and Mother's testimony about them were true.

–25–

We conclude that the exhibits were cumulative of other evidence that Daughter allegedly made an outcry to Mother about the *Lion King* incident, which Dr. Frye and Mother both testified about. The exhibits were therefore not crucial to a key issue. Accordingly, any error in excluding them was not harmful error.

For all the foregoing reasons, we overrule Mother's fifth issue.

### V.  CONCLUSION

Having overruled all of Mother's issues, we affirm the trial court's judgment.

/Bill Whitehill/
BILL WHITEHILL
JUSTICE

170539F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF A.R.M., A CHILD

No. 05-17-00539-CV

On Appeal from the 330th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-13-09646.
Opinion delivered by Justice Whitehill. Justices Fillmore and Boatright participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Scott Allen Moberly recover his costs of this appeal from appellant Krystal Renee Henrichs.


Judgment entered February 1, 2018.