**In the Interest of J.K.F., a child.**

**No. 05–10–00482–CV.**

Court of Appeals of Texas, Dallas.

July 14, 2011.

Lisa Goodwin, Dallas, for Appellant.

Laura M. Shockley, Claus Fleckenstein, Jennifer Ellis, Dallas, for Appellee.

Before Justices MOSELEY, MARTIN RICHTER, and LANG–MIERS.

## OPINION

Opinion By Justice MARTIN RICHTER.

After a jury trial, the trial court terminated the parental rights of Lisa Dawn Goodwin (Mother) to her child, J.K.F., and appointed Claus Fleckenstein (Father) as the sole managing conservator of the child. In seven issues, Mother, pro se, appeals the termination and contends the evidence is legally and factually insufficient to support (a) termination of her parental rights under family code section 161.001(1)(D), (E); (b) a finding that termination of her parental rights is in the best interest of the child; and (c) termination of her parental rights based on conduct. She also complains that procedural and evidentiary errors during trial mandate reversal. For the reasons discussed below, we overrule Mother's issues and affirm the trial court's order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Following the divorce of her parents, six year old J.K.F. made an outcry of alleged sexual abuse against Father. Father was arrested and tried for the alleged crime. A jury acquitted Father in 2007. During the period following Father's arrest and the conclusion of the criminal trial, Father was not allowed visitation with J.K.F. Upon his acquittal, Father sought to renew contact with J.K.F. Mother filed a motion for protective order to prevent all contact by Father; Father filed a motion for issuance of writ of attachment to remove J.K.F. from her Mother's possession. The trial court appointed Patricia Rochelle as amicus attorney for the child and ordered supervised visitation between Father and J.K.F. Father and J.K.F. also met for joint therapy sessions with Dr. Alexandria Doyle, a psychologist who had been treating J.K.F. for over two years. On March 14, 2008, Father filed his original petition to terminate the parent-child relationship of Mother.

On March 19, 2008, the trial court signed interim temporary orders. Nancy Stark was appointed to supervise periods of possession and access awarded to Father. The trial court ordered that visitation was to take place every Wednesday for two hours and for these visits, Father and Stark would pick up J.K.F. at St. John's Episcopal School, where the child attended elementary school. On March 28, 2008, amicus attorney for J.K.F. filed an emergency motion to modify interim orders. The motion advised the trial court of Mother's interference with Father's supervised visitation, expressed her concerns that Mother intended to remove J.K.F. from the jurisdiction of the court, and requested that the child be removed from Mother's possession and placed in the home of family friends. According to the

emergency motion, when Stark and Father arrived for the first visit, J.K.F. attempted to run away. The following week, J.K.F. again attempted to run away. Mother and maternal grandmother appeared at the school and interfered with the visitation. On March 28, 2008, the trial court signed an order on the emergency motion to modify interim orders, removing J.K.F. from the Mother's home and placing her with family friends. The trial court also temporarily restrained Mother from possession or access to the child. Mother filed a counter-petition to modify the parent-child relationship, based on her allegations that Father had a history of family violence and physical abuse and had sexually abused their child. In July 2008, the trial court ordered J.K.F. be placed in Father's home. The court also ordered that all visitation between Mother and J.K.F. be supervised.

On April 8, 2010, the jury found Mother violated family code sections 161.001(1)(D) and (E) and found termination of Mother's parental rights to be in J.K.F.'s best interest. *See* TEX. FAM.CODE ANN. § 161.001(1)(D), (E) (West Supp. 2010). The jury also awarded Father permanent sole conservatorship of J.K.F. On April 16, 2010, the trial court signed an order terminating Mother's parental rights. This appeal followed.

## II. APPELLATE BRIEF AND RECORD ON APPEAL

■ Texas Rule of Appellate Procedure 38.1(g) requires appellate briefs to contain a statement of facts that is supported by record references. TEX.R.APP. P. 38.1(g). Also, Texas Rule of Appellate Procedure 38.1(i) requires appellate briefs to "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX.R.APP. P. 38.1(i). Appellate courts must construe the Texas Rules of Appel-

late Procedure reasonably, yet liberally, so the right to appeal is not lost by imposing requirements not absolutely necessary to effect the purpose of a rule. *See Republic Underwriters Ins. Co. v. Mex–Tex, Inc.,* 150 S.W.3d 423, 427 (Tex.2004); *Burke v. Ins. Auto Auctions Corp.,* 169 S.W.3d 771, 775 (Tex.App.-Dallas 2005, pet. denied); *see also* TEX.R.APP. P. 38.9. However, an appellate court cannot consider documents, hearings, or trials that are cited in the brief and attached as appendices if they are not formally included in the record on appeal. *See Burke,* 169 S.W.3d at 775; *Green v. Kaposta,* 152 S.W.3d 839, 841 (Tex.App.-Dallas 2005, no pet.).

■ Mother provides argument and appropriate citations to authorities and the record to support her contentions. *See Ranger Ins. Co. v. State,* 312 S.W.3d 266, 270 (Tex.App.-Dallas 2010, pet. dism'd). However, throughout her brief, Mother cites to documents in her appendices which were not admitted into evidence in the trial court. Pro se litigants are held to the same standards as attorneys and must comply with all applicable and mandatory rules of pleading and procedure. *See Green,* 152 S.W.3d at 841. We cannot consider those documents that are not properly included in the appellate record or before this Court. *Id.*

## III. SUFFICIENCY OF THE EVIDENCE

■ The termination of parental rights is a matter that implicates fundamental constitutional rights. *See Wilson v. State,* 116 S.W.3d 923, 927 (Tex.App.-Dallas 2003, no pet.); *In re S.N.,* 287 S.W.3d 183, 186 (Tex.App.-Houston [14th Dist.] 2009, no pet.). A trial court may terminate the parent-child relationship if it finds by clear and convincing evidence that: (1) a parent committed one or more of the statutory child-endangering acts or omissions in section 161.001(1) of the fam-

ily code; and (2) termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001(1) (West Supp. 2010). The jury made affirmative findings as to both elements required for termination. In her first, second, third, and fifth issues, Mother contends the evidence is legally and factually insufficient to support termination under the statutory conditions concerning endangerment. In her fourth issue, Mother contends the evidence is legally and factually insufficient to establish that termination is in the best interest of the child.

### A. Applicable Law and Standard of Review

"Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (West 2008); *see Walker v. Texas Dept. of Family & Protective Servs.*, 312 S.W.3d 608, 615 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). On appeal, we apply a standard of review that reflects this burden of proof. *In re J.F.C.*, 96 S.W.3d 256, 264–66 (Tex.2002).

■■ In reviewing the legal sufficiency of the evidence to support a termination finding, we look at all of the evidence in the light most favorable to the termination finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction about the truth of the matter on which the Father bears the burden of proof. *In re J.L.*, 163 S.W.3d 79, 84–85 (Tex.2005); *In re J.F.C.*, 96 S.W.3d at 265–66. We assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *In re J.F.C.*, 96 S.W.3d at 266; *In re C.E.K.*, 214

S.W.3d 492, 496 (Tex.App.-Dallas 2006, no pet.). We do not, however, disregard undisputed evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266.

■ In reviewing the factual sufficiency of the evidence, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex.2002)). We must consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *Id.* If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id.*

### B. Applicable Law

■ The jury found that Mother knowingly placed or knowingly allowed J.K.F. to remain in conditions or surroundings which endangered her physical or emotional well-being and that Mother engaged in conduct or knowingly placed J.K.F. with persons who engaged in conduct which endangered J.K.F.'s physical or emotional well-being. *See* TEX. FAM.CODE ANN. § 161.001(1)(D), (E). "Endanger" means to expose to loss or injury, to jeopardize; it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *See Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987); *In re C.E.K.*, 214 S.W.3d at 496.

■ The relevant time frame within which to determine whether there is clear and convincing evidence of endangerment to the child is before the child was removed. *See In re C.E.K.*, 214 S.W.3d at 496; *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex.App.-Tyler 2003, no pet.); *Ybarra v.*

*Texas Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex.App.-Corpus Christi 1993, no writ). It is not necessary that the offending conduct be directed at the child or that the child actually suffers injury. *See Boyd*, 727 S.W.2d at 533. If the evidence "shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under [161.001(1)(E) ] is supportable." *Id.* at 534.

## C. Discussion

▰▰ In her first issue, Mother contends she is not responsible for endangering her child as set forth in section 161.001(1)(D) and (E) because she did not have possession of J.K.F. for two years prior to the date of termination. According to the record, from March 28, 2008, through the date of the termination trial in April 2010, the child lived with family friends or her father and Mother's contact with her child was supervised. With respect to issues two, three, and five, Mother contends her parental rights should not have been terminated because (1) she believed Father had abused J.K.F., (2) her conduct was in furtherance of her efforts to protect J.K.F. from her Father, (3) J.K.F. demonstrated fear of her Father, and (4) no competent evidence established that Mother was responsible for the child's fears.

The jury heard testimony from Mother describing her volatile divorce from Father and how she became convinced that Father had sexually abused J.K.F. Mother testified she began looking for professionals who could tell her what to do to protect her daughter. She acknowledged interviewing five different doctors and therapists but despite her concerns, she did not report the suspected child abuse herself. Ultimately, a pediatrician, Dr. Clifford, made a child abuse report. Mother testi-

fied that J.K.F. was interviewed by Detective Mayfield, the investigating officer, a therapist at Child Protective Services, and an assistant district attorney in preparation for her trial testimony against Father. J.K.F. was also given a gynecological examination. In 2007, a jury acquitted Father of all charges asserted against him.

Mother testified she still believes Father sexually abused J.K.F. She testified that professionals determined the abuse took place and she has the documents to prove it. However, such documentation was not admitted into evidence during trial and Mother did not present any witnesses at trial, other than herself. Mother testified she did everything she could to protect her daughter from Father. According to Mother, J.K.F. has been "programmed" by the visitation supervisor and the court appointed therapist to believe that her father never abused her. Mother insists the court and court professionals are preventing J.K.F. from seeing a new therapist who will help her find her voice.

Clinical social worker, Nancy Stark, was initially appointed by the court to be the visitation supervisor for supervised visitation between J.K.F. and Father. The pickup and drop-off location for the first visits was J.K.F.'s school, St. John's Episcopal School. Stark testified that at the first visit, school was not in session so J.K.F.'s maternal grandmother dropped her off. J.K.F. walked to Father's car but just as she got to the car, she told Stark she did not want to do the visit and took off running. Stark ran after her and was finally able to get her to stop. Stark testified that when J.K.F. finally started talking to her father, she asked where he had been. Stark testified they talked about memories they had, both good and bad, but nothing was said about sexual abuse. Stark also testified J.K.F. did not appear to be afraid of Father. Stark and

amicus attorney, Patty Rochelle, talked to J.K.F. about running away and she promised she would not do it again.

Stark testified that the following week J.K.F. walked to meet her from her classroom. When they reached Father's car, J.K.F. again tried to run but Stark grabbed her hand. She started crying so Stark took her back inside the school. The headmaster, lower school principal, and J.K.F.'s teacher took J.K.F. to the headmaster's office. Stark and Father joined them in the headmaster's office. J.K.F. then called her mother and grandmother, and the grandmother arrived immediately. Stark told the grandmother she would have to leave the room so Father and J.K.F. could have their visitation. At that point, J.K.F. stopped crying and started talking to Father without further incident. Mother arrived at the school and called 911, reporting to the police that her daughter was in danger. Although the police arrived at the school, the visitation was not interrupted and no arrests were made. Further, the police asked Mother and grandmother to leave.

Stark testified that she became convinced that Mother and grandmother had developed a plan to interfere with visitation between J.K.F. and Father. According to Stark, Mother and grandmother told J.K.F. to run away from Stark and Father, call her grandmother on her cell phone, and grandmother would come get her. When Stark asked Mother to tell J.K.F. to stop running away, Mother accused Stark of torturing J.K.F. by requiring the visits. Stark testified she has never seen any inappropriate behavior between J.K.F. and Father. Further, during the past two years that J.K.F. has lived with Father, J.K.F. has made no complaint to Stark about Father.

After J.K.F. was removed from Mother's home, the trial court ordered that visitation between J.K.F. and Mother be supervised. Stark was appointed by the court to be the visitation supervisor for J.K.F. and Mother's visits. Stark testified that visits between J.K.F. and Mother were going well until Mother became associated with Gina Abio, an advocate for a group called Justice for Children. Over time, Stark noticed that Mother no longer requested all the visitation available to her and she eventually stopped visiting J.K.F. When asked by Stark if she wanted to visit J.K.F. on her birthday, Mother informed Stark she was not going to visit J.K.F. if she had to pay for it (the supervisor fee). Mother made allegations against Stark and filed a grievance against her with the state board.

Stark testified that in February 2010, Mother and Abio began sending e-mails to J.K.F.'s school and parents of children attending the school, accusing Father of being a pedophile and molesting J.K.F. Stark testified that J.K.F. was doing fine now and would be doing even better if her mom had not displayed the kind of behavior she had over the last six months. Stark also testified that Mother constantly reminds J.K.F. in subtle ways that she was abused by Father and should never forget it.

Dr. Alexandria Doyle, clinical psychologist, began treating J.K.F. in September 2005. Doyle testified that at that time, she had been told that J.K.F. had been sexually abused by her father so she began helping her adjust to the changes in her family as well as treating her for sexual abuse. Doyle testified she became concerned about Mother and realized there were times when Mother was out of control emotionally. She determined that Mother had not provided complete information regarding the divorce and the allegation that Father sexually abused J.K.F. She became concerned that Mother exhib-

ited so much anxiety and distress that J.K.F. may have been influenced by Mother and may have conceded to things that did not actually happen. Doyle asked Mother not to talk about Father in front of J.K.F. because it was so distressing to J.K.F.

After Father was acquitted, the court appointed Doyle to conduct joint therapy sessions with Father and J.K.F. to help J.K.F. reunify with Father. She testified that the more comfortable J.K.F. became around Father, the more aggressive and agitated Mother and grandmother became in their attempts to stop visitation between J.K.F. and Father. It became clear to Doyle that Mother and grandmother discussed their attempts to stop the visitation in front of J.K.F. and the child appeared to be terrified. Doyle testified that J.K.F. did not want Mother to talk mean about her Father. After Father and J.K.F. participated in three joint therapy sessions, Mother's attorney notified Doyle that J.K.F. had reacted poorly to the third visit. J.K.F. did not appear for the next two appointments and Mother did not respond to Doyle's requests to talk about her concerns or to bring J.K.F. back to therapy.

Doyle testified that Mother's thoughts were not based in reality and she would not listen to reason. Further, Mother was fixated on her belief that Father was an abuser. Doyle testified that the confusion and anxiety caused when one parent demonizes the other parent can have long-term damaging effects on a child. Doyle ultimately notified the court and attorneys for both parties that she was withdrawing as the court-appointed therapist for J.K.F. Doyle told the court that she had never seen such a rapid escalation of alienating behaviors as she witnessed in Mother. Doyle testified she later received e-mails from Mother stating that the judge, the court, and the attorneys were in a conspir-

acy to keep her away from J.K.F. Doyle also acknowledged that Mother had filed a grievance against her, asserting that because Doyle refused to continue treating J.K.F., Mother was not allowed to have visitation with her daughter. According to Doyle, Mother's allegations were untrue and she was not denied the opportunity for supervised visitation with J.K.F.

In Doyle's opinion, Mother still believes that Father is an abuser, that the danger is real, and that she needs to do whatever she can to protect her daughter. Doyle believes Mother's thinking is fixed, unchangeable, and worse than it was two years earlier when Doyle was still treating J.K.F. Doyle expressed concern that Mother wants to take J.K.F. to a new therapist because Mother believes that if she gets J.K.F. to the right therapist, the child might report a new allegation of sexual abuse against her Father.

The jury heard testimony from Ann Binford, headmaster of the lower school at St. John's Episcopal School, that Mother met with her and Walter Sorenson, head of school, to see if they could do anything to prevent visitation between Father and J.K.F. Binford testified that after Father's second supervised visitation, Mother was so upset and volatile the school decided to hire additional security. Binford also testified that numerous e-mails were sent to school administrators, faculty, staff, and parents of students, describing Father as a pedophile and claiming he abused J.K.F. According to the record, the e-mails named J.K.F.'s third grade teacher and other individuals associated with the school, and made allegations of a conspiracy of fraud, corruption, and abuse in child custody cases involving the courts, court professionals, attorneys, court appointed therapists, teachers, and school administrators. Concerned parents contacted the school, demanding to know why they were

receiving such e-mails and expressing concern about the safety of their children. The school responded to the e-mails by contacting the parents of all their students to let them know what was going on between Mother and Father and what precautions were being taken to protect the students. Binford testified that J.K.F. is doing very well in school. She is getting good grades, is very involved in school and extracurricular activities, and has many friends.

Viewing the evidence in the light most favorable to the termination order, we conclude the evidence is legally sufficient to establish the requisites under section 161.001(1)(E) because a reasonable factfinder could have formed a firm belief or conviction that Mother engaged in conduct which endangered the emotional well-being of the child. TEX. FAM.CODE ANN. § 161.001(1)(E). We have examined the entire record to determine factual sufficiency. Mother and Father dispute certain facts. We conclude, after reviewing the entire record, that the evidence is factually sufficient to allow a rational trier of fact to reasonably form a firm belief or conviction that Mother engaged in conduct that endangered the emotional well-being of the child. See In re J.F.C., 96 S.W.3d at 266.

Because the evidence is legally and factually sufficient to support the trial court's determination under section 161.001(1)(E), we need not address the other endangerment ground the court found to support termination. We overrule Mother's first, second, third and fifth issues.

▆▆▆▆▆ In her fourth issue, Mother contends the evidence is legally and factually insufficient to support the finding that termination of her rights is in the best interest of the child. There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. See In re R.R., 209 S.W.3d 112, 116 (Tex.2006) (per curiam). The focus is on the best interest of the child, not the best interest of the parent. See Dupree v. Texas Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 86 (Tex. App.-Dallas 1995, no writ). However, parental rights may not be terminated merely because a child might be better off living elsewhere. In re D.M., 58 S.W.3d 801, 814 (Tex.App.-Fort Worth 2001, no pet.). The fact finder may consider a number of factors in determining the best interest of the child, including: the desires of the child, the present and future physical and emotional needs of the child, the present and future emotional and physical danger to the child, the parental abilities of the person seeking custody, programs available to assist those persons in promoting the best interest of the child, plans for the child by those individuals, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976). "Best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. See In re C.E.K., 214 S.W.3d at 498.

According to the record, Mother continues to believe that Father abused J.K.F. and Mother continues to state that she will do whatever she can to protect her daughter. The evidence reflects that Mother interfered with the child's supervised visitation with Father. The evidence reflects that Mother's volatile behavior upset the child and caused serious security concerns at the child's school. There is evidence the child was present and visibly upset by Mother's conversations about Father, including Mother's plans to keep Father from ever seeing his daughter again. There is evidence that J.K.F. did not understand and felt abandoned when her

Mother stopped visiting her. Mother would not visit J.K.F. on her birthday because she refused to pay the fee for a supervised visit. When questioned regarding her future plans for J.K.F., Mother's only plan was to get J.K.F. to a new therapist who would help J.K.F. "find her voice."

Mother and her associates launched an e-mail campaign, accusing the court, court personnel, and the amicus attorney of putting J.K.F. through continued trauma by forcing her to live with a father who went to trial for sexually abusing her. Mother apparently did not consider the present or future emotional harm caused to J.K.F. by having such personal information sent to all of the school administrators, the faculty, the parents of all of her school friends, and the media. Doyle testified that the reality J.K.F. sees with respect to Father is different from the reality Mother sees because Mother is so fixated on her belief that Father abused J.K.F. Doyle also testified regarding the confusion, anxiety, insecurity, depression, and isolation that can occur in children in J.K.F.'s situation when exposed to behavior such as Mother's.

Father testified that he finally decided to ask that Mother's parental rights be terminated because J.K.F. has spent over half her life involved in court proceedings. He told the jury that he and J.K.F. have borne the brunt of Mother actions, and he has increasing fear that Mother will not move on but will continue her efforts to falsely accuse him of abusing his daughter. He further testified that he does not think Mother understands that she has placed J.K.F. in emotional harm because Mother lives in her own reality.

The jury could reasonably have found the facts to provide clear and convincing evidence that Mother was unable to provide for J.K.F.'s emotional needs, and that

Mother's conduct created an emotional danger to J.K.F., both now and in the future. The same facts could provide clear and convincing evidence to the jury that Mother lacked the parenting abilities to enable her to retain parental rights of J.K.F. These, along with other of the *Holley* factors, provided the jury with sufficient evidence that termination of Mother's parental rights was in the best interest of J.K.F. Evidence of just one factor may suffice as support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 27. Applying the appropriate standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's finding that termination was in the best interest of the child. We overrule Mother's fourth issue.

## IV. PROCEDURAL AND EVIDENTIARY ERRORS

In her sixth issue, Mother asserts the judgment should be reversed based on incurable errors made by opposing counsel by repeated use of improper jury argument designed to inflame and prejudice the jury against Mother. Mother also complains of statements made in opening and closing argument and assertions presented in the form of suggestive testimony during direct and cross examination. Mother further complains that the trial court improperly admonished her to refrain from making sidebar statements regarding witness testimony.

■ Mother does not provide proper citation to the record in support of this issue. Most of her argument consists of accusations that appellee's counsel and the amicus attorney fabricated evidence, lied to the jury, and personally attacked Mother. After reviewing the record, we do not agree that statements and arguments by appellee's counsel and the amicus attorney

were improper. However, if there was error, it was capable of being cured by a timely objection followed by retraction or instruction by the trial court. *See Living Ctrs. of Texas, Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex.2008); *Texas Employers' Ins. Ass'n v. Haywood*, 153 Tex. 242, 266 S.W.2d 856, 858 (Tex.1954). Without proper objection and preservation pursuant to the rules of civil or appellate procedure, arguments involving curable error are waived on appeal. *See* TEX.R.APP. P. 33.1(a); *see also Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 840–41 (Tex. 1979).

■ Mother admits she did not object during the trial below but claims no objections were required because such arguments were incurable. Mother also asserts she did not have the opportunity to make necessary objections because, at the time opposing counsel made the statements, she was unaware of opposing counsel's alleged failure to support their arguments with evidence. Because she failed to make timely objections to the jury arguments, counsel statements and suggestive questioning about which she now complains, Mother waived her right to object to such arguments, statements and questioning on appeal. *See* TEX.R.APP. P. 33.1(a). Mother's sixth issue is overruled.

■ In her seventh issue, Mother contends the trial court erred by refusing to allow her to call the court-appointed amicus attorney for J.K.F. as a witness. Mother argues that had she been allowed to present evidence or question the amicus attorney herself, she could have established that misconduct by the amicus attorney was sufficient to prevent the amicus attorney from demanding payment from Mother. As an example of the amicus attorney's misconduct, Mother states the amicus attorney sought and obtained court orders imposing drastic changes in the life of J.K.F., without consulting J.K.F. and against J.K.F.'s wishes. The record reflects that Mother filed a motion for amicus attorney to testify; however, according to her motion, such testimony would be limited to the nature and value of legal services rendered in the case. Upon inquiry by the trial judge, the amicus attorney stated she would not be presenting evidence with respect to legal services rendered or asking for fees before the jury. The trial judge then denied Mother's motion. Mother did not object to the trial court's denial of her motion.

An amicus attorney is appointed by the court to represent the best interest of the child. TEX. FAM.CODE ANN. § 107.005(a) (West 2008). An amicus attorney has a duty to participate in litigation to the same extent as attorneys for the parties. TEX. FAM.CODE ANN. § 107.003(1)(F) (West 2008). Here, the amicus attorney served as counsel of record representing the best interest of J.K.F. by questioning witnesses and introducing evidence. She did not testify as to attorneys fees or any other matter. The trial court did not err in refusing to allow Mother to call the amicus attorney as a witness. TEX.R. EVID. 503. Furthermore, because she failed to make a timely objection to the trial court, Mother did not preserve this issue for appeal. TEX.R.APP. P. 33.1(a)(1). Mother's seventh issue is overruled.

## V. CONCLUSION

Based on our resolution of Mother's issues, we affirm the trial court's order of termination.