**AFFIRMED and Opinion Filed September 27, 2024**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-24-00421-CV

## IN THE INTEREST OF D.M. JR., A CHILD

**On Appeal from the 305th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-22-00938-X**

## MEMORANDUM OPINION
Before Justices Reichek, Goldstein, and Garcia
Opinion by Justice Reichek

Father appeals the trial court's decree terminating his parental rights to his child D.M. Jr. In seven issues, he contends the evidence is legally and factually insufficient to support the trial court's findings that (1) his rights should be terminated under sections 161.001(b)(1)(E) and 161.001(b)(1)(O) of the family code, (2) termination of his rights is in the best interest of the child, and (3) the Department of Family and Protective Services should be appointed the child's permanent managing conservator. For reasons that follow, we affirm the trial court's decree.

## Background

D.M. Jr. ("D.M.") was born on October 30, 2022. At the time of his birth, Mother tested positive for cocaine and opiates, and D.M. tested positive for cocaine. Mother and Father lived together before D.M. was born, and Father was at the hospital when D.M. was born. On November 7, 2022, the Department of Family and Protective Services took D.M. into its possession. The next day, the Department filed its original petition seeking, among other things, termination of Father's and Mother's parental rights. The trial court signed an ex parte order for emergency care and temporary custody appointing the Department temporary managing conservator of D.M.

On February 22, 2023, the trial court held the "14-day hearing" required by § 262.201 of the family code. Mother was not present, but was represented by counsel. Veronica Reyna, the Department caseworker assigned to D.M.'s case, testified the Department became involved because it received a referral about Mother's and child's positive drug tests. Since D.M.'s birth, as part of its investigation, the Department made efforts to get both parents to take drug tests, but they did not comply.

The Department conducted home studies on two relatives, Father's ex-sister-in-law and D.M.'s maternal grandmother, to see if D.M. could be placed with them. Both were denied. The ex-sister-in-law was concerned about caring for another child and about financial issues. D.M.'s maternal grandmother did not have an

appropriate place for D.M. to sleep. She planned on putting him in a bottom bunk bed with a baby gate on it. She was also protective of her daughter, and the Department lacked confidence in her ability to protect the child from Mother.

When asked to outline the services the Department was requesting for Father, Reyna stated, "[P]arenting classes, individual counseling, psychological evaluation, random drug testing, drug and alcohol assessment, and also domestic violence counseling."[1] Reyna testified that Mother informed her that she and Father are a couple and that they lived together. D.M. suffered from withdrawals when he came into custody of the Department and had been under a doctor's care. The withdrawal symptoms had lessened over time, and D.M. was doing well in a foster home. The parents had two hours of supervised visitation each week. Father had not gone to the last four visits. When Reyna asked Father to take a drug test, he responded that he was not going to do any services unless they were court ordered.

Father testified remotely. He said he volunteered to take a drug test and passed. According to Father, a man came to his house, took a swab of his mouth, and told him that he passed. Father testified that he and Mother were no longer a couple. Father was living in Dallas by himself in a town home. He testified he was

---

[1] As the Department acknowledges, the record is unclear about why domestic violence counseling was requested. Reyna admitted there was nothing in the affidavit in support of removal to suggest domestic violence counseling was needed in this case. She further indicated there was nothing current for the trial court to review regarding domestic violence. There was no evidence at trial about any domestic violence.

employed, making $22 an hour. He has three other children who were living with his mother in Michigan.

At the conclusion of testimony, the trial court orally made the findings required by family code § 262.201. The court appointed the Department as temporary managing conservator and appointed Mother as temporary possessory conservator. The judge orally ordered "the requested services for both parents." The trial court later signed a temporary order requiring Father to participate in parenting classes, a psychological evaluation, counseling, a drug and alcohol assessment, random drug and alcohol testing, and to follow through with recommendations made by any service providers.

On March 17, 2023, the trial court held a status hearing. The appellate record does not include any reporter's record of that hearing. Before the hearing, on March 6, 2023, the Department filed a "Status Report to the Court." In the report, under the heading "Services and Orders Needed," the Department recommended that Father attend parenting classes, individual counseling, and domestic violence counseling, and undergo a psychological evaluation, a drug and alcohol assessment, and random drug testing. The Department's recommendations were specific and detailed. For each service other than random drug testing, there was at least a paragraph explaining what was required of Father, along with the name and phone number of the organization or person who was going to provide the service. Regarding drug testing, the report stated in part, Father "will submit to random drug

–4–

and alcohol tests within 24 hours of notification. . . . Drug tests can be requested at any time by the Department. Failure to test within 24 hours of notification will be considered a positive test." In the report, the Department asked the trial court to make the service plan an order of the court.

On March 21, 2023, the trial court signed a status hearing order, which recites that Mother and Father appeared at the status hearing through their attorneys. In the order, the trial court made a specific finding that it had reviewed the service plan filed by the Department and found it to be "reasonable, accurate and in compliance with previous orders of this Court." The court further found that Father had reviewed and understood the service plan and had been advised that unless he was willing and able to provide the child with a safe environment, even with the assistance of a service plan, his parental rights may be subject to restriction or termination or the child may not be returned to him. The order states that the "prior Orders in this cause shall be continued in full force and effect, except as changed herein."

The final trial before the court began about a year after D.M. was born, on November 9, 2023, and took place over three non-consecutive days. There were three witnesses—two caseworkers and Father. Mother appeared only through her lawyer.

Reyna, who testified at the 14-day hearing, again testified that the Department became involved in the case after Mother and D.M. testified positive for drugs.[2] After the Department took custody of D.M., it reached out to Father to be a "safety monitor" for D.M. According to the Reyna, Father completed an oral swab test, which indicated possible cocaine and amphetamine use. Father was asked to take a hair strand test, but he refused.

Reyna was responsible for setting up and managing services and visitation for both parents. Initially, two-hour visits were scheduled to occur each Monday. The weekly visits were later canceled "due to inconsistency, and no calls, no shows from both parents." Reyna would text Mother and Father to see if they would like a visit with D.M. and would not receive any response. Mother visited D.M. 10 times in the year the case had been pending. Father visited D.M. 6 times. Father's first 5 visits took place in November and December of 2022. The sixth visit was on April 13, 2023. Father never visited D.M. by himself; he always visited with Mother. When Mother and Father visited D.M. together, they stayed for fifteen to thirty minutes instead of the allotted two hours. Father would say he had to go back to work. He never asked to schedule the visits during a time that would work better with his work schedule.

---

[2] At the November 9 proceeding, Reyna identified herself as Veronica Castillo. Elsewhere in the record her name appears as Veronica Reyna-Castillo.

During the first 5 visits, Reyna observed that Father sat away from D.M. and Mother. He was on his phone the whole time and did not interact with D.M. Reyna observed Father interacting with D.M. only on the last visit. In Reyna's opinion, Father did not consistently demonstrate an appropriate level of bonding. In June 2023, Father texted Reyna to ask for a visit. Reyna let Father and his attorney know her availability for each week of June, but did not hear back.

Reyna testified that once the Department took custody of D.M., it developed a service plan for both Mother and Father. Mother did not initiate any of her services and Reyna had not had contact with her in almost 7 months. Reyna testified Father was court ordered to complete a parenting class, individual counseling, a drug and alcohol assessment, random drug testing, domestic violence counseling, and a psychological evaluation. He did not complete any services. Neither parent indicated to Reyna why they chose not to participate in services. Reyna testified that at the time of the 14-day hearing, she provided the parents with "a copy of the order of those services" she testified about.

D.M. was living with foster parents who were interested in adopting him. As a result of his early drug exposure, D.M. had withdrawal symptoms. In addition, his foster parents believed he was not able to hear properly. But at the time of the proceeding, he was doing well. He had eczema, which was being treated with hydrocortisone.

Reyna testified that Father engaged in conduct and knowingly placed D.M. with persons who engaged in conduct which endangered his physical or emotional well-being. Father also failed to complete the services necessary to obtain D.M.'s return to him. Reyna stated the services are important to show Father is willing to be a parent for D.M. and to fight for his child. Reyna believed Father had constructively abandoned D.M. due to his lack of visitation. Further, if the child was returned to Father, the Department had no idea what type of environment or conditions he would be living in.

Reyna testified again about the home studies conducted of Father's ex-sister-in-law and D.M.'s maternal grandmother and provided some new information. The ex-sister-in-law expressed that she has three children and having another child in her home would be stressful. She also reported that she suffers from anxiety, insomnia, and situational depression and does not take medication for her conditions. The maternal grandmother lived in a small R.V. with no space for a crib, playpen, or bassinet. In addition, the grandmother did not want to provide information or did not know anything about her other grandchildren, so the Department was concerned she would not be "protective over" D.M.

Reyna stated Father had told her he was a maintenance worker at an apartment complex. He attended the previous hearing virtually because he said he was out of town working. That day, he had said he was in construction. When asked what it meant that the oral swab indicated "possible drug use," Reyna testified the lines were

–8–

faint for amphetamines and cocaine, meaning it was a possible indication Father used those drugs. Reyna said she was not sure if Father was positive for cocaine or meth and that is why the Department requested a hair strand.

Reyna had visited Mother and Father's apartment. She only saw the downstairs, but the apartment was livable. Reyna last visited the home on May 25, 2023. After that Father did not want her to visit anymore, and attorneys for the parents informed her not to have any direct contact with the parents.

The trial resumed over two months later, on January 26, 2024. Mother and Father were not present, but their attorneys were. Father was expected to be there.

The Department called Caitlin Edgeworth as a witness. She had taken over for Reyna as the Department caseworker assigned to D.M.'s case. She visited D.M. in his foster home and read up on the case history. D.M. was still doing well in foster care and his foster parents wanted to adopt him.

Since they were last in court on November 9, 2023, Mother had not visited the child and Edgeworth had no contact with her. Edgeworth emailed Father and his attorney about visiting the child and working on the court-ordered services, but she had no contact with him. Father and Mother moved to Michigan because their other kids were there. Edgeworth learned there had been an incident report in Michigan for the other children, but she did not have any details.

After Edgeworth's testimony, the court took a break to wait for Father. After an hour-and-a-half, Father's counsel said Father was on a train from Michigan that

was supposed to arrive before the proceeding began. Father contacted his lawyer to say he was at the station, but Father's phone had died. Counsel had not heard from him since. The judge rescheduled the hearing for January 29 to give Father the opportunity to appear.

When the proceeding resumed on January 29, Father testified that he was in construction. He performs renovations and travels to different cities and states for work. He had his own company and had been doing construction since 2017. Father said he earned close to $60,000 per year. At the time, he was living in a three-bedroom house in Michigan and was renovating an apartment complex there. He had left Dallas in August. He and Mother were no longer a couple and, although she also lived in Michigan, she did not live with him. He lived in Flint, and Mother lived in Benton Harbor, which was "hours away." Father still had contact with her. They had three other children together. These other children lived with his mother because he travels so much. Father denied that CPS or its Michigan equivalent was called to his home in Michigan.

Father testified he wanted D.M. to move to Flint with him. When Father is at work, Father's mother will take care of him. Father was not sure whether he would allow Mother to have access to D.M. He testified that Mother "can come over whenever she wants" to see their three other children. Father said he did not have an issue with Mother's parenting. When asked whether he had an issue with Mother's cocaine use while pregnant with D.M., Father responded, "Allegedly, I – I

–10–

don't know for sure." He later stated that if the judge allows D.M. to come live with him, he would co-parent with Mother.

Father acknowledged that at the beginning of this case, the court ordered "a battery of services" for him to complete to work toward reunification. He did not believe he "should take the classes" and testified that the classes were not important. In addition, Father denied ever taking illegal drugs. He testified "they" came to his house to perform a drug test, which was negative.

The trial court took the matter under advisement and later issued a decree terminating the parental rights of both Mother and Father. Mother's rights were terminated under subsections (D), (E), (N), and (O) of §161.001(b)(1). Father's rights were terminated under subsections (E) and (O). The trial court found that Father engaged in conduct which endangered the physical or emotional well-being of D.M. and failed to comply with the provisions of a court order that established the actions necessary for him to obtain the child's return. The court further found that it was in D.M.'s best interest that Mother's and Father's parental rights be terminated. The court appointed the Department D.M.'s permanent managing conservator.

Father appeals the trial court's decree. Mother did not appeal.

## Applicable Law

A parent's right to the companionship, care, custody, and management of his children is an interest far more precious than any property right. *In re A.C.*, 560

S.W.3d 624, 629–30 (Tex. 2018). But parental rights are not absolute. *Id.* A trial court may terminate the parent–child relationship if the factfinder finds by clear and convincing evidence that (1) the parent's acts or omissions satisfy at least one statutory ground for termination and (2) termination of parental rights is in the child's best interest. *Id.* at 630. "Clear and convincing evidence" is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007.

A finding that must be based on clear and convincing evidence cannot be viewed on appeal in the same way as a finding that may be sustained on a mere preponderance. *In re A.C.*, 560 S.W.3d at 630. The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered. *Id.* In conducting a legal-sufficiency review, we cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding. *Id.* at 630–31. Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true. *Id.* at 631. Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding. *Id.* In a factual-sufficiency review, we must consider whether disputed evidence is such that a reasonable

–12–

factfinder could not have resolved it in favor of the finding. *Id.* Evidence is factually sufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *Id.*

This heightened standard of review does not dispel, however, the deference that an appellate court must grant to the factfinder, who heard the witnesses and evaluated their credibility. *In re J.F.-G.*, 627 S.W.3d 304, 311–12 (Tex. 2021). Because the factfinder is the sole arbiter of the witnesses' credibility and demeanor, appellate review must defer to the trial court's factual determinations, even in parental termination cases. *Id*. at 312.

**Sufficiency of the Evidence**

I.    Statutory Grounds for Termination

The trial court found two predicate grounds listed in the family code for terminating Father's parental rights. It found Father (1) engaged in conduct or knowingly placed D.M. with persons who engaged in conduct which endangered the child's physical or emotional well-being (§161.001(b)(1)(E)), and (2) failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain D.M.'s return (§161.001(b)(1)(O)). In his first four issues, Father challenges the legal and factual sufficiency of the evidence to support these findings.

a.  Subsection (O)

We first consider Father's arguments regarding subsection (O) because whether Father failed to comply with a court order requiring him to complete services also bears on whether he engaged in conduct which endangered D.M.'s physical or emotional well-being under subsection (E) and on the best interest of the child.  *See, e.g., In re J.W.*, No. 05-23-01049-CV, 2024 WL 1340367, at *8 (Tex. App.—Dallas Mar. 29, 2024, no pet.) (mem. op.); *In re K.G.*, No. 13-24-00155-CV, 2024 WL 3898304, at *4 (Tex. App.—Corpus Christi–Edinburg Aug. 22, 2024, no pet.) (mem. op.).  Father acknowledges he did not complete any services.  Nothing in the record indicates he even started any services.  He asserts the record does not show that a service plan was filed with the court as required by § 263.102(a) or that he received a copy of the plan. He thus argues there is no evidence the trial court specifically established the actions necessary for him to obtain D.M.'s return.

Parental rights may be terminated under subsection (O) if clear and convincing evidence supports that the parent

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department . . . for not less than nine months as a result of the child's removal from the parent under Chapter 262 for abuse or neglect of the child.

TEX. FAM. CODE ANN. § 161.001(b)(1)(O).  This subsection authorizes termination for failure to comply with a service plan only when that plan requires the parent to

–14–

perform specific actions. *In re A.L.R.*, 646 S.W.3d 833, 837–38 (Tex. 2022) (per curiam); *In re N.G.*, 577 S.W.3d 230, 238 (Tex. 2019). An order referenced by subsection (O) is sufficiently specific if its terms of compliance are set out with certainty so the parent knows what duties and obligations have been imposed. *In re G.D.P.*, No. 05-19-01068-CV, 2020 WL 401760, at *5 (Tex. App.—Dallas Jan. 24, 2020, pet. denied) (mem. op.). The predicate ground for termination under subsection (O) cannot be proven by clear and convincing evidence if premised on a plan requirement that is unwritten, and thus supplied only by the caseworker's oral testimony, or on one that is written but vague. *In re R.J.G.*, 681 S.W.3d 370, 373 (Tex. 2023). The trial court is most involved in the termination proceedings and is in the best position to address the specificity of an order. *In re N.G.*, 577 S.W.3d at 239.

The Department was required to file a service plan with the trial court no later than 45 days after the trial court appointed the Department as temporary managing conservator. TEX. FAM. CODE ANN. § 263.101. Here, no document entitled "service plan" was filed with the trial court or introduced into evidence at trial. At the 14-day hearing in February 2023, the Department stated that it wanted the court to require Father to undergo parenting classes, individual counseling, psychological evaluation, random drug testing, and drug and alcohol assessment. The trial court orally ordered Father to complete "the requested services" and later signed its temporary order requiring Father to complete those 5 services. In March 2023, the

Department filed a status report with the trial court that contains Father's service plan with specific details and service provider information. The status report was filed prior to the status hearing, the scope of which is "limited to matters related to the contents and execution of the service plan filed with the court." *Id.* § 263.202(b). We do not have a record from that hearing, but the status hearing order recites the trial court reviewed the Department's service plan. The order also recites the trial court found that Father reviewed and understood the service plan. We presume the regularity of a court order absent controverting evidence in the record. *In re E.C.*, No. 05-22-01330-CV, 2024 WL 2126710, at *3 (Tex. App.—Dallas May 13, 2024, no pet.) (mem. op.).

At trial, caseworker Reyna testified she provided a copy of the "order of those services" to the parents. Father did not object in the trial court that the service plan was not filed or was not specific enough. He did not testify that he did not know or understand what was required of him under the court-ordered service plan. Instead, he indicated he did not complete the services because he thought they were unimportant. Further, during closing argument, Father's counsel did not argue that the Department had not proved either predicate ground for termination. Counsel argued termination was not in D.M.'s best interest.

"This is not a case where the record lacks any evidence as to what precisely a parent was to do to obtain the return of a child." *In re V.A.G.*, No. 04-00449-CV, 2019 WL 5927451, at *4 (Tex. App.—San Antonio Nov. 13, 2019, no pet.) (mem.

–16–

op.); *see In re J.M.*, No. 02-21-00346-CV, 2022 WL 872542, at *8 n.11 (Tex. App.—Fort Worth Mar. 24, 2022, no pet.) (mem. op.) (service plan included in status report). Nor does the record show Father was not informed about what he was required to do. The trial court was able to review the services Father was required to complete and so have we. We reject Father's argument that, contrary to what is recited in the status hearing order, the trial court could not have reviewed the service plan because it was not filed with the court. The plan is included in the Department's status report filed with the trial court and its requirements include the services listed in the temporary order and continued in the status hearing order. *See In re E.M.*, No. 02-21-00326-CV, 2022 WL 872600, at *9–10 (Tex. App.—Fort Worth Mar. 24, 2022, no pet.) (mem. op.) (rejecting argument that evidence was insufficient to support subsection (O) finding because no service plan or court order establishing actions necessary for child's return was admitted at trial). Under the facts of this case, we conclude Father's court-ordered services were sufficiently specific. It is undisputed that he did not complete any services. The evidence is legally and factually sufficient to support the trial court's finding under subsection (O). We overrule Father's third and fourth issues.

b. Subsection (E)

Although the evidence is sufficient to support termination under subsection (O), when a trial court makes a finding to terminate parental rights under subsection (E) and the parent challenges that finding on appeal, due process requires the

appellate court to review that finding and detail its analysis, even if it affirms the termination order on other § 161.001(b)(1) grounds. *In re C.W.*, 586 S.W.3d 405, 407 (Tex. 2019) (per curiam). Under § 161.001(b)(1)(E), a person's parental rights may be terminated if the person "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E); *In re C.E.*, 687 S.W.3d 304, 310 (Tex. 2024). Proof that a parent specifically caused an injury is not necessary. *In re C.E.*, 687 S.W.3d at 310. A finding of endangerment is supported if the evidence shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child. *Id.* Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009).

Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re C.V.L.*, 591 S.W.3d 734, 750 (Tex. App.—Dallas 2019, pet. denied). The trial court may consider conduct that occurred before and after the child's birth, in the child's presence and outside the child's presence, and before and after removal by the Department. *Id.*; *see In re J.O.A.*, 283 S.W.3d at 345 (discussing father's actions after removal in evaluating whether factfinder could have formed firm belief of endangerment under subsection (E)).

Father contends that in determining whether there was endangerment, the factfinder could consider only his acts or omissions before D.M. was removed from his parents. Since D.M. did not go home from the hospital with his parents, Father argues Mother's and child's positive drug tests are insufficient to show Father endangered D.M. As support for his argument that the relevant time frame is prior to removal, Father cites one case, *In re J.K.F.*, 345 S.W.3d 706, 711–12 (Tex. App.—Dallas 2011, no pet.). *J.F.K.* relied on *Ybarra v. Texas Department of Human Services*, 869 S.W.2d 574 (Tex. App.—Corpus Christi–Edinburg 1993, no writ), and other cases that relied on *Ybarra*. *Ybarra* involved parental termination under the precursor to § 161.001(b)(1)(D), which permits termination when a parent has knowingly placed or allowed a child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. *Id.* at 577; *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Termination under subsection (D) may be based upon a single act or omission and courts consider the child's environment before the Department obtained custody of the child. *In re D.J.R.*, No. 04-23-00568-CV, 2023 WL 8246666, at *3 (Tex. App.—San Antonio Nov. 29, 2023, no pet.)(mem. op.). Under subsection (E), however, courts may consider conduct both before and after the Department removed the child from his parents. *Id.*; *see In re R.B.*, No. 07-17-00187-CV, 2017 WL 4785328, at *2 (Tex. App.—Amarillo Oct. 19, 2017, pet. denied) (mem. op.) (explaining that evidence of child's surroundings *after* removal

–19–

has little relevance under subsection (D), whereas subsection (E) requires course of conduct).

Evidence showed that D.M. had cocaine in his system when he was born. At the time of his birth, Mother tested positive for cocaine and opiates. Father and Mother lived together before D.M. was born. D.M. suffered withdrawal symptoms. After the Department took custody of D.M., it reached out to Father to be a "safety monitor" for D.M. According to the caseworker, Father completed an oral swab test, which indicated possible cocaine and amphetamine use. Although Father testified that he passed the drug test, the trial court as factfinder was entitled credit the testimony that showed possible drug use, as well as evidence that Father refused further drug testing.

In addition, the trial court ordered Father to participate in services as discussed above. It is undisputed that Father did not complete any of these services to work toward reuniting with D.M. There is nothing in the record to suggest he even started any services; he considered them unimportant.

In the year D.M. was in the Department's custody, Father visited him 6 times. He never visited without Mother and only interacted with D.M. during one visit. He never stayed for more than 15-30 minutes of the allotted two hours. While Father claimed he had to work, he never asked the Department for a visitation time that worked better for him. At the time the final trial began in November 2023, Father had not seen D.M. in almost 7 months.

Also, the trial court as factfinder could have credited the evidence that showed Father refused to acknowledge Mother's drug problem and would allow her to have access to D.M. He indicated he did not have an issue with Mother's parenting. Although, according to Father, they no longer lived together and Mother lived in another town, she came over whenever she wanted to visit their other children. Father testified that if D.M. comes to live with him, Father would co-parent with Mother.

Viewing the evidence in the light most favorable to the trial court's findings, the evidence shows possible cocaine and amphetamine use by Father and a refusal to undergo further drug testing, failure to complete or even begin the services required for reunification with D.M., disengagement from communications with the Department, lack of engagement with D.M. at the few visits with him, as well as a months' long failure to visit his child, and a willingness to give Mother access to D.M. This evidence supports the trial court's determination that Father posed a substantial risk to D.M.'s physical and emotional well-being. *See In re R.R.A.*, 687 S.W.3d 269, 281 (Tex. 2024) (father's failure to drug test, disengagement from communications, services, and children themselves posed substantial risk to children's emotional well-being). The evidence is legally and factually sufficient to support the trial court's subsection (E) finding. We overrule Father's first and second issues.

II.     Best Interest of the Child

In his fifth and sixth issues, Father challenges the legal and factual sufficiency of the evidence to support the trial court's finding that it was in D.M.'s best interest to terminate the parent–child relationship. Before terminating a parent's rights, the factfinder must find that terminating the parent's rights is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b)(2). The best-interest prong of the termination inquiry is child-centered and focuses on the child's well-being, safety, and development. *In re J.W.*, 645 S.W.3d 726, 746 (Tex. 2022). The Texas Supreme Court has identified various nonexclusive factors that guide our review of a best-interest finding: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the person seeking custody; (5) the programs available to assist the person seeking custody in promoting the best interest of the child; (6) plans for the child by the person seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Father argues that an analysis of these factors does not support a finding that termination of his parental rights is in D.M.'s best interest.

The need for stability and permanence is an important consideration for a child's present and future emotional and physical needs. *In re J.W.*, 2024 WL 1340367, at *5. Evidence showed Father was unable to meet D.M.'s physical and

–22–

emotional needs by providing stability and permanence. Father stopped contact with the Department. The Department's caseworkers had no contact with Father or his lawyers in the months leading up to trial. As a result, little was known about Father's situation in Michigan or the conditions there if D.M. was returned to Father. He also failed to participate in programs available to help him regain custody of D.M. and offered no excuse for his failure to do so. He believed they were not important. Further, it is undisputed that Mother's drug use specifically caused injury to D.M. Father did not rule out giving Mother access to D.M. despite her drug use, and it was possible he used drugs himself. He refused to undergo further drug testing, and his service plan provided that failure to test would be considered a positive test. The evidence of drug usage is relevant to the emotional and physical danger to D.M. now and in the future. *See In re G.D.P.*, 2020 WL 401760, at *6.

This and other evidence also raises questions about Father's parenting abilities. He visited D.M. only 6 times during the year before trial began and had not seen him in many months at the time of termination. When he did visit, it was for short periods of time and he only engaged with D.M. once. There was evidence Father did not visit more because he had to work, however, he did not make any effort to schedule visits at a time that would have been better for him.

Evidence showed that D.M.'s foster home was stable. D.M. had been living with his foster parents since he got out of the hospital at the age of 9 weeks. They were meeting his basic needs, and the Department was positive they would continue

to meet his basic needs. D.M. was doing well with his foster parents and they wanted to adopt him. As for alternatives to foster care, Mother and Father had provided two names as possible placements for D.M., Father's ex-sister-in-law and Mother's mother. The Department's home studies indicated placement with these relatives was not suitable.

In arguing termination of his parental rights is not in D.M.'s best interest, Father relies largely on his own testimony. He testified he owns his own home remodeling business and makes $60,000 per year. He testified he lives in a three-bedroom home in Michigan. His mother helps him care for his children when he is working. He also denied using illegal drugs. Reyna, however, testified that Father had told her he was a maintenance worker at an apartment complex. He had not mentioned his construction business to her. Further, Reyna's testimony indicated possible drug use by Father and his refusal to undergo further testing. The trial court, as the factfinder, was the sole judge of witness credibility.

Although there is a strong presumption maintaining the parent-child relationship serves the child's best interest, there is also a presumption that promptly and permanently placing the child in a safe environment is in the child's best interest. *In re J.W.*, 2024 WL 1340367, at \*5. We recognize the best-interest standard does not permit termination merely because D.M. might be better off living elsewhere. *Id.* at \*9. Here, however, after reviewing all the evidence in the light most favorable to the best-interest finding and considering any undisputed contrary evidence, we

–24–

conclude the trial court could reasonably form a firm belief or conviction it would be in D.M.'s best interest to terminate Father's parental rights. Further, we do not find the disputed evidence to be so significant that the trial court could not have formed a firm belief or conviction in favor of termination of parental rights. We conclude the evidence is legally and factually sufficient to support the trial court's best-interest finding. We overrule Father's fifth and sixth issues.

III.    Department as Managing Conservator

In his seventh issue, Father contends the evidence is insufficient to support the appointment of the Department as D.M.'s managing conservator. When both parents' rights are terminated, the trial court must appoint a suitable, competent adult, the Department, or a licensed child-placing agency as managing conservator. TEX. FAM. CODE ANN. § 161.207. Termination of the parent–child relationship divests the parent of all legal rights and duties with respect to the child. *Id.* § 161.206(b). Because we have found the evidence sufficient to support termination of Father's parental rights, he has been divested of his legal rights and duties regarding D.M. As a result, he does not have standing to challenge the portions of the decree appointing the Department managing conservator because any error could not injuriously affect his rights. *See In re L.E.H.*, No. 05-18-00903-CV, 2018 WL 6839565, at *6 (Tex. App.—Dallas Dec. 31, 2018, no pet.) (mem. op.). We overrule Father's seventh issue.

We affirm the trial court's decree.

/Amanda L. Reichek/<br>AMANDA L. REICHEK<br>JUSTICE

240421F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF D.M., JR., A CHILD

No. 05-24-00421-CV

On Appeal from the 305th Judicial District Court, Dallas County, Texas Trial Court Cause No. JC-22-00938-X.
Opinion delivered by Justice Reichek. Justices Goldstein and Garcia participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee, the Department of Family and Protective Services, recover its costs of this appeal from appellant.

Judgment entered this 27th day of September 2024.